# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| OHIO HEAD START ASSOCIATION, INC.,<br>144 Westpark Road<br>Dayton, OH 45459,<br><br>OHIO ASSOCIATION OF COMMUNITY<br>    ACTION AGENCIES<br>50 West Broad Street, Ste. 1616<br>Columbus, OH 43215,<br><br>MASSACHUSETTS ASSOCIATION FOR<br>    COMMUNITY ACTION<br>105 Chauncy Street, Ste 301<br>Boston, MA 02111,<br><br>      Plaintiffs,<br><br>      v.<br><br>UNITED STATES DEPARTMENT OF<br>    HEALTH AND HUMAN SERVICES,<br>200 Independence Avenue, S.W.<br>Washington, DC 20201,<br><br>KATHLEEN SEBELIUS, Secretary,<br>    U.S. Department of Health and<br>    Human Services,<br>200 Independence Avenue, S.W.<br>Washington, DC 20201,<br><br>      Defendants. | Case No. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Ohio Head Start Association, Inc. ("OHSA"), Ohio Association of Community

Action Agencies ("OACAA"), and Massachusetts Association for Community Action

("MASSCAP") hereby file this complaint against defendants United States Department of Health

and Human Services and Kathleen Sebelius in her official capacity as Secretary, United States

Department of Health and Human Services (collectively, "HHS" or "Defendants") pursuant to

the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA"), seeking (1) a declaration that

Defendants' rules codified at 45 C.F.R. Part 1307 are arbitrary, capricious, and otherwise

contrary to law, and (2) an injunction against Defendants' implementation of those rules.

## INTRODUCTION

1.      At the heart of this dispute are certain changes that Congress made in late 2007 to

the Head Start Act (codified at 42 U.S.C. §§ 9831-9852c).  Among those changes was a

requirement that Defendants promulgate new regulations effectuating a sea change in the manner

in which Head Start grants have been administered since the inception of the program in 1964.

Specifically, the 2007 changes to the Head Start Act required the creation of a new "Designation

Renewal System" or DRS.  The purpose of the DRS is to determine which awardees provide

"high-quality, comprehensive" Head Start services and which do not.  If Defendants conclude

that a Head Start program is not providing high-quality, comprehensive services, the DRS would

require that program to enter into a competition to keep its Head Start funding.

2.      Since this new system changed over forty years of practice, Congress included in

the Head Start Act and accompanying legislative history detailed directions to Defendants about

both the substance of the DRS and the process that they must follow in issuing the new

regulations.  As to the substance, Congress was clear that the purpose of the DRS is to determine

which Head Start programs are providing "high quality comprehensive" services.  In report

language, Congress also made clear that such a determination should not rely on the then current

"on-site review" system for evaluating Head Start programs which was described in one House

report as "an overly bureaucratic, punitive and hostile review system that has not reliably

evaluated program compliance" but should instead come up with a new system that appropriately

measures program quality.  To help Defendants develop this system, Congress required in the Act the appointment of an expert panel to provide guidance on what criteria should be used to determine program quality and further required that, to the extent that Defendants rejected the expert panel's guidance, they provide a "clear rationale" for doing so.

3.      Despite these statutory requirements, the legislative history, and the advice of the expert panel detailed below, Defendants did exactly what they were directed not to do.  They did not implement a system that measures the quality of services provided as recommended the expert panel.  Instead, they implemented a system that relies heavily on the discredited on-site review system, automatic triggers and isolated incidents to determine if an agency is of low quality.  The information used to make these determinations can be many years old and, in fact, employs corrected on-site review findings from as far back as June of 2009 to label a Head Start program as a poorly performing agency today.   This use of corrected findings is a clear example of a retroactive rule, *i.e.* a rule that attaches new consequences to past actions and was implemented without any statutory authorization.  In sum, the DRS regulations fail in almost every respect to meet the requirements and objectives of the Head Start Act and certainly fail to measure the quality of the services currently being provided by a Head Start program, all done without any cogent rationale.

4.      The damage to Plaintiffs' members subject to the new system is considerable. They have been publicly and unjustifiably labeled as "low performing" and as "programs that don't work" by no less than the President of the United States.  They have been forced to divert precious resources to competing to keep their Head Start grants, often their major source of funding and, to make matters worse, they must compete for their funding under competition

requirements that all but guarantee that they will lose the competition for their grants. All of this is due to Defendants failure to conduct a rulemaking that is either lawful or rational.

Plaintiffs specifically allege as follows:

## JURISDICTION

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331. Venue is proper under 28 U.S.C. § 1391(e). The declaratory and injunctive relief sought in this action is authorized by 28 U.S.C. §§ 2201-2202. Judicial review of HHS's actions is authorized under 5 U.S.C. §§ 701-706.

## PARTIES

2.     OHSA is a not-for-profit membership corporation established under the laws of the State of Ohio and is exempt from federal income taxation pursuant to Section 501(c)(4) of the Internal Revenue Code of 1986. OHSA was founded in 1976 as a professional organization dedicated to advocacy, training and providing support to its individual members, member agencies, partners and others providing services to Head Start-eligible children and families under 42 U.S.C. §§ 9831-9852 ("Head Start Act"). OHSA currently has sixty-three member agencies, all of which are non-profit or local government recipients of federal financial assistance authorized under the Head Start Act. Ten of those members are harmed by Defendants' conduct alleged herein and all are subject to the new regulations. OHSA's offices are located in Dayton, Ohio. OHSA brings this action on its own behalf and on behalf of its member Head Start programs and its members who are employees of Head Start programs.

3.     OACAA is a not-for-profit membership corporation established under the laws of the State of Ohio and is exempt from federal income taxation pursuant to Section 501(c)(4) of the Internal Revenue Code of 1986. OACAA was founded in 1976 with the purpose of assisting

4

Ohio's community action agencies in carrying out anti-poverty activities through advocacy and quality training programs for agency employees, officers, and directors. OACAA's current membership consists of 48 community action agencies of which 37 receive federal financial assistance authorized under the Head Start Act. Five of those members are currently harmed by Defendants' conduct alleged herein. OACAA's offices are located in Columbus, Ohio. OACAA brings this action on its own behalf and on behalf of its member Head Start programs.

4.      MASSCAP is a not-for-profit membership corporation established under the laws of the Commonwealth of Massachusetts and is exempt from federal income taxation pursuant to Section 501(c)(3) of the Internal Revenue Code of 1986. MASSCAP was founded in 1991 as an organization dedicated to providing basic support, education, training, and advocacy services to community action agencies operating in Massachusetts. MASSCAP supports these agencies in pursuit of a common mission: addressing the causes of poverty as the most cost-effective way to help people achieve self-sufficiency. MASSCAP's current membership consists of 24 community action agencies of which 17 receive federal financial assistance authorized under the Head Start Act. Two of those members are harmed by Defendants' conduct alleged herein. MASSCAP's offices are located in Boston, Massachusetts. MASSCAP brings this action on its own behalf and on behalf of its member Head Start.

5.      Defendant United States Department of Health and Human Services is an agency of the government of the United States within the meaning of 5 U.S.C. § 701(b)(1). The Head Start Act designates the Secretary of HHS as the executive branch official responsible for the administration of the federal Head Start and Early Head Start programs. The Secretary has delegated authority over these programs to an operating division within HHS, the Administration

for Children and Families ("ACF"). ACF issues federal grants to over 1,700 local private and

public agencies to carry out the purposes of the Head Start and Early Head Start programs.

6.      Defendant Kathleen Sebelius is the Secretary of the United States Department of

Health and Human Services and is therefore the official within the executive branch of the

United States government ultimately responsible for carrying out the programs and activities of

that department according to the mandates of federal law.

## LEGAL FRAMEWORK OF HEAD START/EARLY HEAD START

A.      *Statutory Authorization and Funding Structure*

7.      The Head Start program came into existence soon after the enactment of the

Economic Opportunity Act of 1964. It delivers comprehensive, high quality services to either

low-income or categorically eligible families and is designed to foster the healthy development

of children from ages three to the age of compulsory school attendance. The Head Start program

provides a wide range of individualized services, including education and early childhood

development, medical, dental, and mental health and nutrition.

8.      The Head Start program was subsequently expanded to include services to

eligible families with children from birth to age three, as well as pregnant women. This

expansion is known as Early Head Start.

9.      The Head Start Act provides that HHS will implement the Head Start/Early Head

Start program through awards of federal financial assistance to local public, private not-for-

profit, and private for-profit organizations qualified for designation as "Head Start agencies." 42

U.S.C. § 9836(a)(1). In order for an organization to qualify for such a designation, the

organization must demonstrate, among other things, its capacity to (1) "provide comprehensive

health, educational, nutritional, social, and other services needed to aid participating children . . .

to prepare children to succeed in school," (2) provide appropriate services to children with special physical and/or educational needs, (3) meet the needs of children and families whose primary language is other than English, (4) involve parents in a meaningful fashion in the planning, design, and implementation of Head Start activities, and (5) coordinate with local child care providers and educational institutions to ensure that participating children are prepared to enter elementary school by the age of compulsory school attendance.  42 U.S.C. § 9836(d)(2).

B.    *Head Start Monitoring, Enforcement, and Quality Assurance*

10.    The Head Start Act further provides that once entities are designated as Head Start agencies, they are subject to monitoring by HHS through periodic on-site reviews for the purpose of "determin[ing] whether Head Start agencies meet standards . . . established under this subchapter with respect to program, administrative, financial management, and other requirements, and in order to help the programs identify areas for improvement and areas of strength as part of their ongoing self-assessment process . . . ."  42 U.S.C. § 9836a(c)(1).  Those reviews must occur no less frequently than once every three years.  *Id.*

11.    If, in the exercise of its monitoring function, HHS finds instances of grantee "deficiencies" or "noncompliance," the grantee must initiate corrective actions in order to continue receiving Head Start financial assistance.  *See* 45 C.F.R. §§ 1304.60, 1304.61.

12.    The Head Start Act defines the term "deficiency" to mean:

(A) a systemic or substantial material failure of an agency in an area of performance that the Secretary determines involves—

(i) a threat to the health, safety, or civil rights of children or staff;

(ii) a denial to parents of the exercise of their full roles and responsibilities related to program operations;

7

(iii) a failure to comply with standards related to early childhood development and health services, family and community partnerships, or program design and management;

(iv) the misuse of funds received under this subchapter;

(v) loss of legal status (as determined by the Secretary) or financial viability, loss of permits, debarment from receiving Federal grants or contracts, or the improper use of Federal funds; or

(vi) failure to meet any other Federal or State requirement that the agency has shown an unwillingness or inability to correct, after notice from the Secretary, within the period specified;

(B) systemic or material failure of the governing body of an agency to fully exercise its legal and fiduciary responsibilities; or

(C) an unresolved area of noncompliance.

*See* 42 U.S.C. § 9832(2).

13.     HHS demands that grantees immediately cure deficiencies that either (1) involve a risk to the health or safety of program participants or staff, or (2) "pose[] a threat to the integrity of Federal funds . . . ." 42 U.S.C. § 9836a(e)(1)(B)(i).  As to all other deficiencies, HHS may require correction either within 90 days of grantee notification (if HHS deems such a time frame to be reasonable) or by the deadline set in an HHS-approved "quality improvement plan" (which can be no later than one year after grantee notification).  42 U.S.C. § 9836a(e)(1)(B)(ii)-(iii).

14. A grantee's failure timely to correct a deficiency will result in termination of its designation as a Head Start agency and loss of federal financial assistance under the Head Start Act. 42 U.S.C. § 9836a(e)(1)(C); 45 C.F.R. § 1304.60(f).

15. HHS Head Start regulations define a "noncompliance" as any other departure by a Head Start agency from its obligations under applicable "Federal or State requirements . . . in ways that do not constitute a deficiency . . . ." 45 C.F.R. § 1304.61(a). After identification of an instance of noncompliance, HHS will notify the grantee in writing of its finding and direct the grantee to effect all necessary corrections by the date set forth in that notice. *Id.* "A grantee which is unable or unwilling to correct the specified areas of noncompliance within the prescribed time period will be judged to have a deficiency which must be corrected, either immediately or pursuant to a Quality Improvement Plan . . . ." 45 C.F.R. § 1304.61(b).

16. Although HHS regulations provide a mechanism for administrative review of enforcement actions arising out of a grantee's failure timely to correct one or more deficiencies, no such administrative appeal is available for deficiency determinations in and of themselves. It is only where a deficiency has gone uncorrected and HHS has taken steps to terminate a grantee's Head Start financial assistance that the grantee might be able to challenge an HHS deficiency finding.

C. *2007 Head Start Reauthorization/Amendments*

17. On December 12, 2007, Congress reauthorized the Head Start Act in the Improving Head Start for School Readiness Act of 2007, Pub. L. No. 110-134, 121 Stat. 1363 (2007) (the "2007 Reauthorization").

18. Prior to HHS's implementation of certain provisions of the 2007 Reauthorization, grants awarded to entities designated as Head Start agencies were for an "indefinite" project

period, *i.e.*, HHS automatically renewed a grantee's funding from year to year so long as the

grantee met Head Start programmatic and regulatory requirements.

19.     As amended, the Head Start Act now mandates five-year grant periods, which can

be renewed on a competitive or non-competitive basis depending on various factors as specified

in the Designation Renewal System ("DRS") regulations.  42 U.S.C. § 9836(c).  Congress

charged HHS to issue rules that would comprise a "transparent, reliable, and valid" system for

designation renewal.  42 U.S.C. § 9836(c)(8).  The 2007 Reauthorization specifically required

HHS to convene an expert panel to develop a set of recommendations for structuring and

implementing the DRS, and to incorporate such recommendations into DRS regulations.  42

U.S.C. § 9836(c)(2)-(4), (10).

20.     Congress contemplated that HHS would review grantees before the end of each

five-year funding cycle.  If grantees are "delivering a high-quality and comprehensive Head Start

program," they would automatically receive an additional five years of funding.  If they were

found not to be delivering a "high-quality and comprehensive Head Start program," they would

have to compete for their next five years of funding.  42 U.S.C. § 9836(c)(7)(A).  The 2007

Reauthorization thus established for the first time in the Head Start program this distinction

between "high-quality" and "non-high-quality programs."

21.     The 2007 Reauthorization also provided for a "transition" period to take place

during the first three years of implementation of the DRS regulations.  Over the course of this

transition, each grantee would be reviewed to determine whether it is "delivering a high-quality

and comprehensive Head Start program."  42 U.S.C. § 9836(c)(9).  Those grantees meeting this

standard would receive an automatic extension of funding for five years.  Grantees determined

not to meet this standard must submit an application in an open competition to retain its designation as a Head Start agency.

22. As explained in the legislative history of the 2007 Reauthorization, Congress sought to balance two competing policy considerations in establishing the Designation Renewal System. One consideration was that "open competition," when limited to "under-performing" Head Start programs, will "improve overall program performance." H.R. Rep. 110-439, at 111 (2007). The opposing consideration was that Congress "strongly believe[s] the majority of Head Start programs are delivering high quality services . . ." and that "competing high quality programs could undermine overall program quality." *Id.* The conference report goes on to explain that:

> The Conferees believe that in most instances, stability and continuity within Head Start promotes better quality and greater efficiency. It helps the organization become trusted within the community it is serving, thereby creating better community relations and better outreach to eligible children and families. Continuity and stability provided by high-quality grantees helps programs to recruit and retain better teachers and to plan appropriately for professional development. Lack of continuity and stability can also have a significant impact on cost effective resource allocation by affecting a program's ability to leverage funds in its community and negotiate lower facility costs and business loans. The continuity of high-quality grantees better ensures that taxpayer monies spent on professional development and facilities are investments that have ongoing benefit to children served by Head Start. In developing the designation renewal system, the Conferees intend for the Secretary to give due consideration to the involvement of outside experts and take the public comment on the proposed system seriously.

*Id.* In short, Congress was balancing the beneficial effects of competition with the beneficial effects of having stability in program operations.

23. Congress voiced a second concern about the implementation of the DRS in a report of the House of Representatives Committee on Education and Labor, which produced the original bill containing the Designation Renewal System concept. This concern relates to

significant weaknesses in the HHS monitoring process and resultant data. The Committee noted the following:

> . . . the Committee strongly encourages the expert panel and the Secretary to use [information from the triennial on-site review] more thoughtfully than simply tabulating whether a grantee has been deemed deficient or not. The Committee believes the *process of determining whether a grantee is deficient is seriously flawed*, and Assistant Secretary for Children and Families, Wade Horn, informed Committee staff that an internal quality control process has found the determination of deficiency to be unreliable. Furthermore, the Committee believes that *there are high quality programs that are deemed deficient and there are seriously under-performing programs that are not deemed deficient*. Therefore, in including the triennial review as data for the application review system, the Committee encourages the panel to use the data cautiously and wisely.

H.R. Rep. 110-67, at 61 (2007) (emphasis added). The Committee further stated that "[i]nstead of providing a balanced review of programs that helps identify programs strengths and weaknesses, the [monitoring process] is an overly bureaucratic, punitive and hostile review system that has not reliably evaluated program compliance." *Id.* at 62.

## FACTUAL ALLEGATIONS

A.   *DRS Rulemaking Process*

24.   HHS convened the expert panel required under the 2007 Reauthorization in 2008. During the expert panel's deliberation process, the panel sought from HHS, and HHS provided, suggestions for a model for the redesignation renewal system.

25.   The expert panel issued its final report in December 2008. The report, which incorporated many of HHS's own suggestions, made the following recommendations:

a.   The expert panel recommended at page 3 of its report that HHS utilize a system of two types of indicators to determine if a grantee is not delivering high-quality services: "automatic indicators," *i.e.*, events "of such a serious nature that a single occurrence would automatically require a grantee to compete for renewal"; and

12

"key quality indicators," which would "require competition where a pattern of poor performance on multiple indicators is present."

b.  The panel emphasized that the designation renewal system should be "one component of a broader, coordinated approach to ongoing program improvement," and the requirement to recompete should be "focused on those grantees that do not improve sufficiently, despite the ongoing systems of technical assistance already in place."

c.  The automatic indicators recommended by the panel were suspension of federal funding, bankruptcy or debarment, revocation of a license to operate a child care program, and "a high number of deficiencies."

d.  On the question of deficiencies, the panel stated that it:

> . . . believes that grantees should be automatically required to compete if they are found to have deficiencies far more than the average grantee.  The Committee recommends defining this as having a number of deficiencies that is two standard deviations from the mean.  The use of standard deviations to determine the specific number of deficiencies that would require a grantee to compete is appropriate because it ensures that grantees required to compete have an exceptionally high number of problems.

e.  The panel recommended that for the "key quality indicators," ACF should establish a "threshold . . . to determine whether a grantee must compete for renewal . . . . This threshold should have external validity in that it makes a meaningful distinction between programs providing high-quality services and programs that are not."  The panel recommended that ACF "ensure that the data used in assessing Key Quality Indicators is as current as possible (no more than one year old except for special cause)."

26.     Per the requirement in 42 U.S.C. § 9836(c)(1), HHS issued a notice of proposed rulemaking ("NPRM") on September 22, 2010 containing a set of proposed DRS regulations "integrat[ing] the recommendations of the expert panel."  *See* U.S. Dept. of Health and Human

Servs., Admin. for Children and Families, "Head Start Program – Notice of Proposed Rulemaking," 75 Fed. Reg. 57,704 (Sept. 22, 2010).

27.     Concurrently with publishing the NPRM, HHS was required to provide a report to two Congressional committees including a detailed description of the proposed DRS and a "clear rationale" for any differences between the recommendations of the expert panel and the provisions of the NPRM. 42 U.S.C. § 9836(c)(10)(B).

28.     The NPRM described the DRS as a "test for redesignation of poorly performing grantees." 75 Fed. Reg. at 57,707.

29.     HHS summarized the findings of the expert panel, and acknowledged that the function of the panel was "to inform the development of a DRS," but HHS rejected the panel's core recommendations without providing any reasoned explanation for its course of action.

30.     Disregarding the expert panel's recommendation that HHS use data no more than one year old when determining the quality of a grantee's program, HHS proposed to use some data collected as early as June 12, 2009 (the "look-back period") in DRS reviews conducted during a transition period consisting of the three years after the effective date of the regulation. Despite the absence of any provision in the 2007 Reauthorization contemplating retroactive application of the HHS regulations, HHS stated that to apply the requirements of the DRS to findings occurring as early as June 2009 was "consistent with [42 U.S.C. § 9836(c)(9)(B)], which specifies that Head Start agencies are not subject to the DRS requirements prior to 18 months after the enactment of [the 2007 Reauthorization]." 75 Fed. Reg. at 57,708.

31.     In substance as well, the NPRM failed to incorporate the recommendations of the expert panel as required by the statute. Whereas the panel had recommended the distinction between "automatic indicators" and "key quality indicators" – and had strongly emphasized that

the latter should be applied by using a qualitative analysis to identify programs that were actually not providing high-quality services – the NPRM simply included seven conditions for re-competition, all of which amounted to automatic indicators.

32.    The NPRM provided that a Head Start agency "*shall* be required to compete for its next five years of funding whenever the designated ACF official determines that one or more of the" seven conditions existed during the look-back period.  75 Fed. Reg. at 57,717 (emphasis added).  No qualitative analysis was to be used to determine if the condition meaningfully indicated that a Head Start agency was not high-performing.

33.    Those seven conditions were as follows:

a.    An agency "has been determined by [HHS] to have one or more deficiencies on a single review" conducted on a triennial, follow-up, or other basis at any time during the look-back period;

b.    An agency has been determined not to have met certain goals for improving the school-readiness of participating children;

c.    An agency has been determined to have insufficient scores on the Classroom Assessment Scoring System (CLASS) tool, an evaluation tool used by HHS;

d.    An agency has "had its license to operate a Head Start or Early Head Start center or program revoked by a State or local licensing agency" during the look-back period;

e.    An agency has been suspended from the Head Start program by HHS during the look-back period;

f.  An agency has been "debarred" – *i.e.*, legally precluded – from receiving federal or state funds or has been disqualified from the Child and Adult Care Food Program during the look-back period; or

g.  An agency has been determined during the twelve months preceding the designated ACF official's review during the look-back period to have "either one or more material weaknesses or to be at risk for failing to continue functioning as a going concern."

34.   While each of the seven conditions used in the NPRM was either redundant of or in conflict with HHS's existing monitoring and enforcement framework, HHS's most dramatic departure from the panel's recommendations related to the first condition identified above.  By listing "one or more deficiencies on a single review" as a trigger for recompetition, the NPRM effectively provided that a *single* deficiency, which the Head Start agency has duly corrected, and which HHS identified as early as June 12, 2009, is automatic grounds for the grantee to be required to compete.

35.   Through the use of a *single* deficiency, this provision of the NPRM contradicts the panel's recommendation that only "deficiencies far more than the average grantee" should constitute an automatic indicator.  Through the use of a *corrected* deficiency, the provision contradicts the panel's recommendation that the DRS should focus on grantees that "do not improve sufficiently, despite ongoing systems of technical assistance already in place."  Through the use of deficiency findings *dating from June 2009*, the provision contradicts the panel's recommendation that the DRS use data not more than one year old.

36.   The NPRM provided for no appeal of the ACF official's determination that a grantee met one of the seven conditions for "poorly performing" programs, despite the fact that

the designation of a grantee as "poorly performing" (and concomitant requirement that the grantee compete to retain its Head Start funding) amounts to adverse agency action.

37.    The DRS as proposed in the NPRM therefore effectively short-circuits the existing monitoring and technical assistance system in Head Start (described in ¶¶ 10-16 above), under which a deficiency finding can result in a final agency action of termination of the grant only after (1) the Head Start agency has an opportunity to correct the deficiency; and (2) upon ACF's determination, after a follow-up visit, that the deficiency has not been corrected, the Head Start agency has an opportunity to appeal the termination decision.

38.    In the NPRM, HHS provided two justifications for using the standard of "one or more deficiencies on a single review" for determining that a grantee "has demonstrated poor performance that should require the grantee to recompete for renewal." 75 Fed. Reg. at 57,708. First, HHS stated, "[f]ailure to correct a deficiency within the allotted time . . . is grounds to terminate an agency" from Head Start. *Id.*   Second, HHS noted that deficiencies detected in monitoring reviews conducted under the Head Start Act "may include findings in the specific 'Key Quality Indicators' noted in the Committee's recommendations." *Id.* at 57,709.

39.    HHS did not acknowledge that under the expert panel's recommendations, data included in the "key quality indicators" would be grounds for recompetition only if the data exceed a threshold with "external validity" that meaningfully identified those programs that were not providing high-quality services.  Moreover, HHS did not acknowledge that while an *uncorrected* deficiency may lead to termination of the Head Start agency, the Head Start Act and implementing HHS regulations guarantee a Head Start grantee the opportunity to correct a deficiency and thus achieve "compliant" status.

40.     Nowhere in the NPRM did HHS specifically justify its rejection of the expert panel's recommendation concerning the number of deficiencies necessary to constitute an "automatic indicator" forcing the grantee to recompete: "two standard deviations from the mean." It was only in HHS's statutorily-mandated report to the congressional committees responsible for Head Start oversight that HHS explained that it decided against reliance on standard deviations because grantees would find it confusing and would otherwise be "inconsistent with the [expert panel's] recommendations to ensure the system is applied equitably across all grantees and to establish a clear threshold to determine which grantees must recompete."

41.     HHS issued its final rule on November 9, 2011. *See* U.S. Dept. of Health and Human Servs., Admin. for Children and Families, "Head Start Program – Final Rule," 76 Fed. Reg. 70,010 (Nov. 9, 2011). The final rule included substantially the same seven conditions as the NPRM for when a grantee is required to recompete for its next five years of funding. As it had in NPRM, HHS tacitly acknowledged that it was applying the Designation Renewal System retroactively, and sought to justify this retroactive application – *i.e.,* the use of the look-back period extending back to June 12, 2009 – on the ground that June 12, 2009 "is the date specified in the Act before which the system for designation renewal cannot apply." 76 Fed. Reg. at 70,011.

42.     HHS justified its use of "one or more deficiencies on a single review" as one of the seven conditions for requiring a grantee to recompete, by stating that this standard is "grounded in the [expert panel's] recommendations related to 'Key Quality Indicators.'" 76 Fed. Reg. at 70,015.

43.     The effective date of the Final Rule was December 9, 2011.

B.    *DRS Implementation*

44.    On December 20, 2011, HHS published on the Office of Head Start website a list

of the 130 programs that ACF identified in an initial review as being required to recompete

because one of the seven conditions applied to those programs ("the Recompete List").

45.    Concurrently with this announcement, HHS issued a press release characterizing

the agencies identified for recompetition as substandard and/or poorly-performing grantees.  The

press release specifically stated that those agencies "do not meet quality thresholds established

by the Office of Head Start."

46.    President Obama made statements to similar effect at the time of the issuance of

the Final Rule.  On November 8, 2011, the President Obama said with respect to the DRS that

"[i]f a program isn't giving children the support they need to be ready for school . . . then other

organizations will be able to compete for the grant," and that "[w]e will take money from

programs that don't work and put it into programs that do."

47.    Certain member Head Start agencies of each of the plaintiffs herein received a

letter from Yvette Sanchez Fuentes, the Director of the Office of Head Start within HHS, in mid-

December 2011 ("Recompetition Notice").    The Recompetition Notices stated, in pertinent part:

> Programs no longer automatically qualify for renewed funding unless they meet
> certain criteria.  This letter is to inform you that [Head Start agency] does not
> meet that criteria, and therefore, if [Head Start agency] wishes to continue to
> receive Head Start or Early Head Start funding, it must submit an application and
> compete with other entities in its community for the funding.

48.    After listing the specific applicable condition serving as the basis for placing the

Head Start agency on the Recompete List, the Recompetition Notice further states:

> This is *not* a grant termination or suspension notice, but rather a notice that,
> should it wish to continue to receive Head Start funds, [Head Start agency] must
> submit an application pursuant to a funding opportunity announcement that will
> be published in early 2012.

49.    For each affected member agency, the ground for placement on the Recompete List by HHS was the presence of a deficiency finding as a result of a triennial or other review from June 12, 2009 to the date of the notification letter.

50.    Each affected member agency has taken action to correct the subject deficiency finding.  Moreover, with the exception of one agency that has taken corrective action but is still awaiting its notice, the member agencies have received official notification from HHS that the member agency has returned to full compliance with applicable Head Start requirements.

51.    Plaintiffs' affected member agencies did not have an opportunity to contest the deficiency finding(s) triggering the Recompetition Notice.  In a number of instances, the member agency reasonably believed that (1) HHS's deficiency finding was in error, and (2) the member agency's policies and practices already conformed to applicable Head Start regulations.  Had those member agencies been aware at the time they were informed of the deficiency finding that HHS would attach adverse legal consequences to past deficiency determinations – regardless of whether the member agency corrected the deficiency – the agencies would have taken steps to dispute HHS's decision.

52.    This is no matter of idle concern or speculation.  OHSA member agency Child Development Council of Franklin County ("CDCFC"), in Columbus, Ohio, received a notice of deficiency contained in a follow-up review report dated April 11, 2011, relating to a disallowance of $100 gift cards given to CDCFC employees.  CDCFC had issued those gift cards as additional bonus or incentive compensation to staff at year-end and had charged those costs to its Head Start grant.  CDCFC's gift card expenditures were permissible under governing federal cost principles under 2 C.F.R. Part 230, Appendix B, and were authorized under CDCFC's own policies and procedures.  CDCFC determined that it was not cost-effective to pursue a legal

challenge to the disallowance decision in light of the amounts at issue and therefore chose to

refund payment to HHS. The April 11, 2011 notice of deficiency did not advise CDCFC that the

deficiency finding constituted final agency action for purposes of CDCFC's placement on the

Recompete List.

53.    HHS performed a follow-up visit to CDCFC on November 15, 2011 relating to

the gift card issue, and informed CDCFC that based on its corrective actions, there were no

remaining issues. HHS, however, has not yet as of the date of this Complaint issued a formal

written notice to this effect.

54.    Another member agency – Miami Valley Child Development Centers

("MVCDC") in Dayton, Ohio – also received a notice of deficiency from HHS on September 28,

2010. MVCDC's deficiency finding was based on a single instance of human error by an

employee, and the incident was self-reported to HHS by MVCDC. On September 15, 2010, a

staff member – in violation of MVCDC's clear policy that children be released only to parents,

legal guardians, or others identified in writing – allowed the grandmother of a child to pick up

both that child and another child in the program. The grandmother was under the impression that

a play date had been scheduled for the two children for that day. Upon discovery of her error,

the grandmother immediately returned the second child to the Head Start facility. MVCDC

investigated the incident, discussed the matter with the child's family, notified HHS of the

incident, and terminated the staff member involved for having violated the policy.

55.    MVCDC had ample reason to dispute the deficiency finding. The notice of

deficiency that MVCDC received cited a regulation requiring grantees to institute policies

ensuring that children are released only to a parent or legal guardian and providing for

appropriate disciplinary action for employees who fail to abide by those policies. MVCDC's

policies complied with this requirement and MVCDC enforced the provision rigorously, as is evident from the fact that MVCDC terminated the offending employee. The notice of deficiency, however, did not advise MVCDC that the deficiency finding constituted final agency action for purposes of placement on the Recompete List, nor did it provide for any avenue of administrative review of the finding.

56.     On October 5, 2010, MVCDC President and Chief Executive Officer Mary Burns wrote a letter about the deficiency finding to Yvette Sanchez Fuentes, the Director of the Office of Head Start within HHS. In that letter, Ms. Burns disagreed with the deficiency finding in light of the one-time element of the event and MVCDC's strong performance as a Head Start agency over time. The letter further explained that given the uncertainty of what the DRS rule would look like and what would trigger a program having to compete, it would be unfair to hold this incident against MVCDC. Ms. Burns never received a reply to her letter.

57.     MVCDC received written notification from HHS on or about December 9, 2010 stating that MVCDC had corrected the alleged deficiency. In addition, the HHS reviewer responsible for reviewing MVCDC's actions to correct the alleged deficiency wrote to MVCDC to state that she was "very impressed with the strong systems you have in place to not only keep track of the children, but also to express care and concern for them on a daily basis."

58.     A third member agency – Community Action Commission of Fayette County, Inc. ("CACFC") – was the subject of a deficiency determination dated September 9, 2010 relating to CACFC's method of allocating administrative staff salaries to its Head Start operations. CACFC's cost allocation system had previously been deemed noncompliant in November 2006. As a result of that earlier finding, CACFC developed and instituted policies providing a reasonable basis for distributing administrative compensation costs among CACFC's

various programs.  By letter dated June 12, 2007, HHS notified CACFC that it found those

policies to be acceptable and that CACFC had satisfactorily corrected the noncompliance.

59.     In a subsequent monitoring site visit, however, the HHS reviewers took issue with

those same CACFC's cost allocation policies and found them to be in violation of applicable

federal grant cost principles.  HHS directed CACFC to correct that noncompliance within 120

days of the notification.

60.     CACFC responded to this finding by presenting the policies previously approved

by HHS that resolved the 2006 noncompliance finding.

61.     HHS deemed that response to be insufficient and therefore converted the

noncompliance finding into a deficiency.  HHS based its determination on the notion that

CACFC did not have an "Indirect Rate Agreement" with HHS approving CACFC's method of

distributing administrative salary costs.  HHS thus utterly ignored the fact that it had previously

given its blessing and approval to CACFC's cost allocation policies.

62.     Accordingly, CACFC had ample reason to dispute the deficiency finding.  By

HHS's own earlier account, CACFC's policies complied with applicable federal grant cost

principles.  The notice of deficiency, however, ignored that fact altogether.  Moreover, the notice

of deficiency did not advise CACFC that the deficiency finding constituted final agency action

for purposes of placement on the Recompete List, nor did it provide for any avenue of

administrative review of the finding.

## HARMS TO PLAINTIFFS AND THEIR MEMBERS

63.     HHS's decision to require plaintiffs' members on the recompete either results or

will likely result in substantial and palpable harms to those members.

64.    As an initial matter, the affected member agencies suffer reputational harms to the extent that HHS's decision amounts to a finding that the members provide substandard or inadequate services to Head Start children and families.  HHS, Secretary Sebelius, and President Obama himself have portrayed the affected member agencies as poorly-performing Head Start agencies that should be replaced by entities better capable of providing Head Start services.  Such characterizations are overly broad, unfair, and/or baseless, yet the public's perception of the affected member agencies will account for – and, hence, suffer as a result of – those portrayals.

65.    Affected member agencies must also incur expenses associated with recompetition with no assurance that they will be able to recoup those funds even if they succeed in retaining their Head Start grants.

66.    The most significant injury that the affected member agencies face is the likelihood of loss of designation as a Head Start agency.  The Head Start Act specifically requires that any recompetition process not only consider an applicant's demonstrated ability to provide "comprehensive," "high-quality" services to the target population, but also provide priority to "applicants that have demonstrated capacity in providing effective, comprehensive, and well-coordinated early childhood education and development services and programs to children and their families." 42 U.S.C. § 9836(d)(3).  If HHS determines that there is no qualified applicant within the community served, "the Secretary *shall designate* a qualified agency to carry out the Head Start program in the community on an interim basis until a qualified applicant from the community is designated . . . ." 42 U.S.C. § 9836(f) (emphasis added).  In short, the DRS requires that the process for recompetition will be biased against the agencies that have been designated for recompetition.

67.     In light of the fact that HHS has placed the affected member agencies on the Recompete List because it has found them not to be capable of providing comprehensive, high-quality services, there is a strong likelihood that they will lose their Head Start agency designation and Head Start funding.  This is true because (1) HHS will only select local applicants that it deems to have the requisite capacity to provide services, and (2) should HHS find that no such applicants exist, it will designate an interim Head Start agency from outside the applicant pool.  In other words, it appears that HHS will not renew the affected member agencies' designations even if they are the best applicants in the recompetition because it has already determined that those agencies are not providing high-quality, comprehensive services.

## CAUSES OF ACTION

## COUNT I

### ADMINISTRATIVE PROCEDURE ACT:
**Agency Action as Arbitrary, Capricious, and/or Contrary to Law**

68.     Plaintiffs reallege and incorporate herein by reference paragraphs 1 through 67, above.

69.     The DRS final rule is arbitrary and capricious in violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

70.     HHS failed adequately to integrate the recommendations of the expert panel in drafting and promulgating the final rule.

71.     HHS failed to provide any rational basis for its departures from the recommendations of the expert panel with respect to reliable/current data and frequency/severity of deficiencies.

72.     HHS's decision to require plaintiffs' member agencies to recompete based on corrected deficiencies is otherwise arbitrary and/or irrational.

## COUNT II

### ADMINISTRATIVE PROCEDURE ACT:
#### Impermissible Retroactive Rulemaking

73.     Plaintiffs reallege and incorporate herein by reference paragraphs 1 through 72, above.

74.     The final rule is contrary to law in violation of the Administrative Procedure Act in that it attaches new adverse legal consequences to past conduct without express congressional authorization to do so.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court enter an order:

1. Declaring Defendants' final rule to be contrary to the Head Start Act, as amended by the 2007 Reauthorization;

2. Declaring Defendants' application of the final rule to conduct pre-dating the effective date of the final rule to be contrary to law;

3. Declaring Defendants' final rule to be arbitrary and capricious in substance;

4. Remanding the final rule to HHS for further proceedings to bring HHS into compliance with its legal obligations;

5. Enjoining Defendants from implementing the final rule so as to require plaintiffs' members to recompete for their Head Start agency designations; and

6. Affording plaintiffs such other and further relief as the Court deems just and equitable.

Date:   February 24, 2012                    Respectfully submitted,

                                             Edward T. Waters (DCD No. 422461)
                                             Robert A. Graham (DCD No. 450345)
                                             Susannah Vance (DCD No. 496163)

                                             FELDESMAN TUCKER LEIFER FIDELL LLP
                                             1129 20th Street, N.W., 4th Floor
                                             Washington, DC 20036

                                             (202) 466-8960 (telephone)
                                             (202) 293-8103 (facsimile)

                                             E-mail:    ewaters@ftlf.com
                                                        rgraham@ftlf.com
                                                        svance@ftlf.com