# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| OHIO HEAD START ASSOCIATION, INC., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, <br><br> Defendants. | **Civil Action No. 12-309 (CKK)** |

## MEMORANDUM OPINION
(July 9, 2012)

As part of the Improving Head Start for School Readiness Act of 2007, Congress instructed the Defendants in this action, the United States Department of Health and Human Services ("HHS") and Kathleen Sebelius, Secretary of HHS (collectively, "Defendants" or "the Secretary"), to promulgate regulations requiring low-performing grantees to compete for five-year grants, rather than receive automatic renewal of their grants under the Head Start program. Following this directive, in 2011 HHS enacted the Designation Renewal System ("DRS"). The DRS requires recipients of Head Start grants to compete for new five-year grants if, among other things, the grantees received one or more "deficiency" findings during the relevant time period. Plaintiffs are four not-for-profit membership corporations that provide services to community action agencies receiving Head Start grants. Several of the Plaintiffs' member agencies have been designated to compete for new five-year grants. Plaintiffs filed suit against HHS and Secretary Sebelius in her official capacity, alleging that the so-called "single deficiency trigger" is invalid because it (1) is impermissibly retroactive; (2) deprives Plaintiffs of protected property and liberty interests without

1

due process; and (3) is arbitrary and capricious.  Am. Compl., ECF No. [8], ¶¶ 71-79.  The Plaintiffs initially sought a preliminary injunction, but withdrew the motion in favor of expedited resolution of this matter on the merits.  *See* Jt. Notice, ECF No. [9]; 3/29/12 Minute Order.  Presently before the Court are the parties' cross-motions for summary judgment[1] and Plaintiffs' [23] Motion to Strike or, in the Alternative, Motion for Leave to File Surreply.  For the reasons stated below, the Court finds (1) the DRS is not retroactive; (2) the Plaintiffs failed to identify a protected property or liberty interest warranting due process protection, and in any event received sufficient due process; and (3) the DRS rule is neither arbitrary nor capricious.  Accordingly, Plaintiffs' [16] Motion for Summary Judgment is DENIED and Defendants' [18] Cross-Motion for Summary Judgment is GRANTED. Plaintiffs' [23] Motion to Strike or, in the Alternative, Motion for Leave to File Surreply is also DENIED.

## I. BACKGROUND

### A.   *The Head Start Program*

Administered by the Office of Head Start ("OHS"), part of the Administration for Children and Families ("ACF," itself part of HHS), Head Start is a national program that provides health, educational, nutritional, and other services to children of low income families in order to promote school readiness.  Admin. Record ("A.R.") 03326 (DRS Final Rule).  Established in 1965, the Head Start program awards grants to local agencies—public, non-profit, and for-profit—to provide "comprehensive child development services," with an emphasis on enabling preschool children to develop skills necessary to succeed in school.  *Id.*; *see* Economic Opportunity Act of 1964, 42

---

[1]  For ease of reference, the Court shall refer to the parties' pleadings as follows: Pls.' Mot. for Summ. J., ECF No. [16] ("Pls.' Mot."); Defs.' Opp'n and Cross-Mot. for Summ. J., ECF Nos. [17, 18] ("Defs.' Cross-Mot."); Pls.' Opp'n and Reply in Support, ECF Nos. [19, 20] ("Pls.' Reply"); Defs.' Reply, ECF No. [21]; Pls.' Notice of Suppl. Auth., ECF No. [28] ("Pls.' Notice").

U.S.C. § 9831 *et seq*. (2007).   Congress expanded the program in 1995 to include services for pregnant women and children under the age of three ("Early Head Start").   Head Start Act Amendments of 1994, 42 U.S.C. § 9840a (2007).   In some locations, umbrella agencies receive Head Start grants, but delegate the provision of actual services to member agencies.   A.R. 00284 (Oct. 2008 Advisory Comm. Report).   The Plaintiffs are organizations that provide support services to member agencies, known as community action agencies.   In this case, the member community action agencies receive grants directly from the Head Start program.   Am. Compl. ¶¶ 2-5. Regardless of the grant structure, the agency responsible for directly providing services is known as a "Head Start agency."   A.R. 03345 (DRS Final Rule).

B.      *Head Start Program Monitoring*

In order to monitor the quality of services provided by grantees and delegate agencies, the Head Start program conducts four types of reviews (1) reviews of newly designated Head Start agencies following the first year of providing services; (2) triennial reviews, evaluating each Head Start agency at least once during a three year period; (3) follow-up reviews of Head Start agencies found to have at least one deficiency or significant areas of non-compliance; and (4) unannounced on-site visits.   42 U.S.C. § 9836a(c)(1); *see also* 42 U.S.C. § 9836a(c)(2) (detailing the composition of review teams and areas of assessment).   On-site reviews may lead to identification of two types of violations: deficiencies and non-compliances.   A deficiency is defined as

    (A)     A systemic or substantial material failure of an agency in an area of performance that the Secretary determines involves-

          (i)     a threat to the health, safety, or civil rights of children or staff;

          (ii)    a denial to parents of the exercise of their full roles and responsibilities related to program operations;

          (iii)   a failure to comply with standards related to early childhood development and health services, family and community partnerships, or program design and management;

          (iv)   the misuse of funds received under this subchapter;

          (v)    loss of legal status (as determined by the Secretary) or financial viability, loss of permits, debarment from receiving Federal grants or contracts, or the improper use of federal funds; or

          (vi)   failure to meet any other Federal or State requirement that the agency has shown an unwillingness or inability to correct, after notice from the Secretary, within the period specified;

    (B)     systemic or material failure of the governing body of an agency to fully exercise its legal and fiduciary responsibilities; or

    (C)     an unresolved area of noncompliance.

42 U.S.C. § 9832(2).  If a Head Start agency is found to violate "Federal or State requirements . . . in ways that do not constitute a deficiency," the agency will be labeled as "non-compliant."  45 C.F.R. § 1304.61(a).  The Secretary "will notify the grantee promptly, in writing, of the finding, identifying the area or areas of noncompliance to be corrected and specifying the period in which they must be corrected."  *Id.*  A non-compliance will be re-classified as a deficiency if the grantee fails "to correct the specified areas of noncompliance within the prescribed time period."  *Id.* § 1304.61(b).

      As part of the various types of program reviews set forth in the statute, teams of monitors perform on-site inspections evaluating each Head Start agency's compliance with "program, administrative, financial management, and other requirements."  42 U.S.C. § 9836a(c)(1); A.R.

03331 (DRS Final Rule).  If issues are identified on-site, the monitoring team will speak to agency

personnel during the process of the review.  A.R. 03332; *e.g.*, A.R. 01604 ("[T]he Site Director at

the [Head Start agency] confirmed the metal screws protruding from the fenceposts posed a safety

hazard.").  The review team submits evaluation materials to HHS, and experts from the Office of

Head Start and ACF determine if the agency is non-compliant or deficient.  A.R. 03332.  "The Act

does not provide for an appeal of deficiency findings, unlike terminations and suspensions lasting

more than 30 days."  *Id.*  However,

> [G]rantees currently have the opportunity to discuss the progress of the monitoring
> review while the review team is on site.  Although the final determination is not
> made during the on-site review, grantees consistently are informed of the opportunity
> to provide additional input when concerns are identified while the team is on-site.

*Id.*

Deficiencies that "threaten[] the health or safety of staff or program participants or pose a

threat to the integrity of Federal funds" must be corrected immediately.  42 U.S.C.

§ 9836a(e)(1)(B)(i).  Other deficiencies must be resolved within 90 days of identification of the

deficiency, or within one year pursuant to a Quality Improvement plan, as proscribed by the

Secretary.  *Id.* § 9836a(e)(1)(B)(ii)-(iii), (e)(2)(A)(ii).  If an agency fails to correct the deficiency

within the relevant time frame, HHS will issue a letter of termination, which may be appealed to the

Departmental Appeals Board.  *Id.* § 9836a(e)(1)(C); A.R. 03331.

  C.  *2007 Reauthorization of Head Start*

Historically, Head Start grants were issued for a single year but automatically renewed each

year until the grantee relinquished the grant or HHS terminated the grant.  A.R. 00001 (Proposed

DRS Rule).  The Government Accountability Office issued a report in 2005 criticizing this practice,

finding that "[w]hen grants are allowed to remain with poorly performing grantees, children being

served may not be getting the 'head start' they deserve because the grantees continuously fail to meet program and financial management standards." *Id.* (quoting U.S. Gov't Accountability Office, GAO-05-176, Head Start: Compreh. Approach to Identifying and Addressing Risks Could Help Prevent Grantee Fin. Mgmt. Weaknesses 28 (Feb. 2005)).  The GAO urged ACF to implement a system requiring certain grantees to compete, but ACF expressed concern that it was not authorized to do so under the Head Start statute.  A.R. 00001-02.  The GAO turned to Congress and urged it to consider implementing a competition system.  A.R. 00002.  As part of the Improving Head Start for School Readiness Act of 2007 ("2007 Reauthorization"), Congress responded by amending the Head Start Act to require the Secretary to

> [D]evelop a system for designation renewal that integrates the recommendations of the expert panel . . . to determine if a Head Start agency is delivering a high-quality and comprehensive Head Start program that meets the educational, health, nutritional, and social needs of the children and families it serves, and meets program and financial management requirements and standards [outlined in the statute].

42 U.S.C. § 9836(c)(1).  Congress specifically provided that the designation system should be based on (1) "annual budget and fiscal management data"; (2) "program reviews"; (3) "annual audits"; (4) "classroom quality"; and (5) "Program Information Reports," each as specified in the Head Start Act.  *Id.*  Furthermore, the system should be "fair, consistent, and transparent," and "[t]he Secretary shall periodically evaluate whether the criteria of the system are being applied in a manner that is transparent, reliable, and valid."  *Id.* § 9836(c)(8).  Ultimately, the stated goal was to create a system that could be used to evaluate "whether a Head Start grantee is successfully delivering a high-quality and comprehensive Head Start program," and "whether the grantee has any unresolved deficiencies found during the last triennial review."  *Id.* § 9836(c)(6)(A)-(B).

Congress directed the Secretary to convene a panel comprised of experts in early childhood program accreditation, early childhood development, governance and finance of nonprofit

organizations, delivery of services to special needs children, and assessment of programs for young

children.  42 U.S.C. § 9836(c)(2)-(3).  One employee from the Office of Head Start and an executive

director of a Head Start agency would also sit on the panel.  *Id.*  The panel was charged with the task

of making recommendations on a proposed designation renewal system.  *Id.* § 9836(c)(4).

Concurrent with a public notice and comment period, the Secretary was required to submit a report

to Congress detailing the proposed designation system and that "include[d] a clear rationale for any

differences between the proposed system and the recommendations of the expert panel, if any such

differences exist."  *Id.* § 9836(c)(10)(B).  Congress required a similar report after the notice and

comment period but prior to implementing the DRS.  *Id.* § 9836(c)(10)(C).

> D.       *Advisory Committee Recommendations and Proposed/Final Regulation*

The Secretary convened an expert panel in 2008, referred to as the "Advisory Committee," to

make recommendations regarding the design for a designation renewal system.  The Advisory

Committee issued four reports discussing a variety of approaches towards constructing an

appropriate designation system.  A.R. 00017-00390.  In the end, the Advisory Committee provided

both overarching and specific recommendations for a proposed rule.  Broadly speaking, the

Advisory Committee recommended that the Secretary enact a system that is "reliable and valid in

terms of the criteria and indicators used," "transparent to families, programs and the public,"

"[s]imple and easily understood by all stakeholders," and "[i]ntegrated into ongoing systems for

program improvement in such a way as to add value."  Additionally, the final rule should "[u]se

multiple sources of valid and reliable data," utilize "Automatic Indicators" of a "serious nature,"

include "Key Quality Indicators" reflecting a pattern of poor performance, "[e]stablish a clear

threshold to determine which grantees must compete," and "[a]pply the designation renewal system uniformly across all grantees."[2]   A.R. 00345 (Dec. 2008 Advisory Comm. Final Report).

The Committee explained "[t]he system should be based on Automatic Indicators, whose occurrence would automatically require a grantee to compete for renewal, and Key Quality Indicators, where a pattern of poor performance in multiple areas would require a grantee to compete." A.R. 00349.  "Based on these Indicators," the Committee noted "there should be a clear threshold to determine which grantees must compete for renewal of the Head Start grant."  *Id*.  In terms of automatic indicators, the Committee recommended that the following factors automatically trigger competition: "(1) suspension; (2) bankruptcy or debarment; (3) revocation by a state or local government of a license to operate a child care program; and (4) a significantly higher number of deficiencies in OHS monitoring than the average grantee." A.R. 00345.  Specifically in reference to deficiencies:

> The Committee believes that grantees should be automatically required to compete if they are found to have deficiencies far more than the average grantee. The Committee recommends defining this as having *a number of deficiencies that is two standard deviations from the mean*. The use of standard deviations to determine the specific number of deficiencies that would require a grantee to compete is appropriate because it ensures that grantees required to compete have an exceptionally high number of problems. The Committee agreed that a grantee would be required to compete even if all the deficiencies are in one area because their occurrence is a marker of poor performance that warrants competition.

A.R. 00350 (emphasis added).

Based on the Committee's recommendation, the Secretary published notice of a proposed rule on September 22, 2010.  A.R. 00001.  The proposed rule provided, in pertinent part, that

---

[2]  Although the Committee issued extensive recommendations regarding various aspects of a proposed system, the Court's analysis focuses on the single deficiency trigger as it is the only aspect of the final DRS challenged by the Plaintiffs in this case.

(a)     A minimum of 25 percent of all Head Start grantees (including both Head Start and Early Head Start grantees) reviewed in the same year will be required to compete for their next five years of funding.

(b)     A Head Start or Early Head Start agency shall be required to compete for its next five years of funding whenever the designated ACF official determines that one or more of the following seven conditions existed during the relevant time periods:

(1)     An agency has been determined by ACF to have one or more deficiencies on a single review[.]

A.R. 00014.  In her report to Congress, the Secretary addressed the Defendants' decision to use a single deficiency trigger rather than the recommended "two standard deviations from the mean":

> While we considered using standard deviations to determine the threshold, we were concerned that this methodology would not be simple and easily understandable for grantees because the data used would vary for each cohort of grantees reviewed, as well as for each review cycle, since not all grantees will be reviewed simultaneously. As a result, we believed this would be inconsistent with the Committee's recommendations to ensure the system is applied equitably across all grantees and to establish a clear threshold to determine which grantees must recompete. Ultimately, we believe that whether a grantee has experienced "one or more deficiencies in a single review" is a simple, transparent, and fair threshold that can be applied uniformly for all grantees.

A.R. 03257 (Report to Cong. on the Proposed Head Start Program Designation Renewal Sys.).

ACF received extensive feedback from the public regarding the proposed DRS.  A.R. 03349-22251.  The public comments were highly critical of the requirement that a minimum of 25% of all head start grantees be forced to compete for new grants, which led ACF to abandon the minimum threshold.   A.R. 03330-31 (DRS Final Rule).   ACF also received a "significant number" of comments concerning the single deficiency trigger, both in favor of and against the requirement. A.R. 03331.  Despite concerns from the public regarding the monitoring process and relative importance of different types of deficiency findings (among other things), ACF retained the single deficiency trigger as originally written in the final DRS.

HHS promulgated the final DRS rule on November 9, 2011.  45 C.F.R. § 1307.1-8.  In addition to the single deficiency trigger, the final rule requires a Head Start agency to compete for a new grant if the agency (1) fails to establish appropriate program goals; (2) fails to take specified steps to achieve "school readiness goals"; (3) receives classroom observation scores below a certain threshold; (4) has its state or local operating licenses revoked; (5) is suspended from the Head Start or Early Head Start program by ACF; (6) is barred from receiving state or federal funds; or (7) is at risk of failing to function as a going concern at any point in the twelve months prior to designation under the DRS.  A.R. 3346 (DRS Final Rule, 45 C.F.R. § 1307.3(b)-(g)).

## II. PRELIMINARY MATTERS

Before reaching the merits of the parties' respective positions, the Court must address several preliminary issues raised by the parties.  First, Plaintiffs have moved to strike Defendant's Reply, and in the alternative requested leave to file a surreply.  Plaintiffs contend the relief requested is warranted in light of Defendants' attachment of the Declaration of Colleen Rathgeb to their Reply and the addition of new arguments in their final pleading.  Plaintiffs' outrage at Defendants' submission of the Rathgeb Declaration is either disingenuous or demonstrates a complete lack of self-awareness for two reasons: (1) Plaintiffs submitted ten declarations and otherwise relied on information "outside the Administrative Record" in support of their Motion for Summary Judgment; and (2) Plaintiffs' Reply in support of their own motion is rife with new arguments, including brand new interpretations of the governing legal standard(s).  The Court is bound by the governing legal standard limiting portions of the Court's analysis to the Administrative Record.  Accordingly, as set forth below, the Court shall disregard the outside materials submitted by both parties as required by the Court's circumscribed role in evaluating agency decisions under the Administrative Procedures Act.  In terms of new arguments, if the Court were to disregard every new argument offered by the

parties in their Reply briefs, the relevant pleadings would be cut nearly in half.  However, Plaintiffs are correct that Defendants' argument that grantees can and have challenged deficiency findings after being designated for competition, Defs.' Reply at 12 n.8, was raised for the first time in Defendants' Reply, and should have been raised in Defendants' Cross-Motion.  Therefore, the Court shall disregard footnote eight of Defendants' Reply and the Rathgeb Declaration.

Second, the Court would like to address the parties' excessive use of footnotes.  The briefing of the parties' cross-motions demonstrates that counsel in this case is highly skilled, and counsel for both sides artfully presented complex legal arguments.  However, the parties' tendency to respond to important substantive issues in footnotes frustrates the overall effectiveness of their briefs, and overall appears to be an attempt to circumvent the page limits set forth in the Local Civil Rules. Across the pleadings for the three motions currently pending before the Court, the Court identified at least twenty-five footnotes directly addressing significant substantive issues.  Counsel in this case, for lack of a better phrase, should know better.  In this case, the Court will address the parties' footnotes as relevant, but in the future, if the parties consider an argument important, they would do well to include it in the body of their briefs.  *GSS Grp. Ltd. v. Nat'l Port Auth.*, 680 F.3d 805, 812 (D.C. Cir. 2012) (finding the district court did not abuse its discretion in rejecting an argument presented only in a footnote).

### III.  LEGAL STANDARD

The parties have cross-moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  When considering a motion for summary judgment, the court may not make credibility determinations or weigh the evidence; the evidence must be analyzed in the light most

favorable to the nonmoving party, with all justifiable inferences drawn in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The mere existence of a factual dispute, by itself, is insufficient to bar summary judgment. *See Liberty Lobby*, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

## IV.  DISCUSSION

Plaintiffs contend the DRS is invalid for three reasons: (1) the regulation is impermissibly retroactive; (2) the regulation divests Plaintiffs of protected property and liberty interests without adequate due process; and (3) the regulation is arbitrary and capricious in violation of the APA. As explained below, none of Plaintiffs' arguments is valid. First, the DRS relies on antecedent data for future grant renewal decisions, but is not legally considered a retroactive regulation. Second, the Plaintiffs failed to identify any protected property or liberty interest for due process purposes, and in any case, the Defendants provide sufficient constitutional due process to Head Start agencies in making deficiency findings. Third and finally, the Secretary provided a clear rationale for departing from the Advisory Committee's recommendations, and the regulations are not otherwise arbitrary or capricious.

A.    *The Designation Renewal System is not Impermissibly Retroactive*

Plaintiffs initially argue that the DRS is impermissibly retroactive "in violation of long-standing Supreme Court precedent and in excess of [the Secretary's] statutory authority." Pls.' Mot. at 27. Plaintiffs' argument is simple: the DRS attaches new legal consequences to past conduct, namely, deficiency findings made before the final rule went into effect. Pls.' Mot. at 27-28 (citing *Marrie v. SEC*, 374 F.3d 1196, 1207 (D.C. Cir. 2004)).

> Reference to the past does not itself make a regulation retroactive. Rather, in evaluating whether a statute or regulation has a retroactive effect we consider "whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." Such an effect is permissible only if the relevant statute shows the Congress clearly so intended.

*Boniface v. U.S. Dep't of Homeland Sec.*, 613 F.3d 282, 288 (D.C. Cir. 2010) (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994)).  A regulation is not retroactive "merely because it draws upon antecedent facts for its operation."  *Landgraf*, 511 U.S. at 270 n.24.  Courts have recognized "the distinction between a rule that imposes new sanctions on past conduct, which is retroactive and invalid unless specifically authorized, and one that merely 'upsets expectations,' which is secondarily retroactive and invalid only if arbitrary and capricious." *Nat'l Petrochemical & Refiners Ass'n v. EPA*, 630 F.3d 145, 159 (D.C. Cir. 2010).  Plaintiffs only challenge the purported "primary retroactivity" of the DRS.  *See* Pls.' Reply at 3.

### 1.   Use of Antecedent Data to Determine Future Eligibility

Even if designation under the DRS wholly precludes the Plaintiffs from obtaining Head Start grants via the competition process, the DRS regulations would not be considered retroactive because they do not terminate current grants.  The D.C. Circuit has routinely held that regulations that use past data to determine future eligibility or future rates are not retroactive.  For example, the court in *Administrators of the Tulane Educational Fund v. Shalala*, 987 F.2d 790 (D.C. Cir. 1993), addressed regulations enacted in 1989 that required re-auditing past costs (specifically from 1984) for graduate medical education used to calculate Medicare reimbursements.  *Id.* at 791.  The court found the regulations were not retroactive because the revised 1984 figures would be used "only to calculate future reimbursements," and would not affect the reimbursements originally granted to recipients for 1984.  *Id.* at 798.  Similarly, in *Bell Atlantic Telephone Companies v. Federal Communications*

*Commission*, 79 F.3d 1195 (D.C. Cir. 1996), the plaintiffs challenged regulations that required telecommunications providers to recalculate their 1994 earnings in order to determine what price caps would apply to their rates in 1995. *Id.* at 1206. Finding the regulations were not retroactive, the court explained,

> The [regulations] are purely prospective. They determine how much a carrier can charge for services that it will provide in the future. They do not render current tariffs unlawful, and they do not require carriers to refund money they have already earned. Rather, the sharing rules draw upon the "antecedent facts" of a local exchange carrier's prior earnings and sharing obligations—and what those earnings indicate about the local exchange carrier's productivity—in establishing the local exchange carrier's sharing obligation for the next period. . . . It is used to determine future rates, and does not change or invalidate any current tariffs.

*Id.* at 1206-07. Finally, in *Association of Accredited Cosmetology Schools v. Alexander*, 979 F.2d 859 (D.C. Cir. 1992), the plaintiffs challenged regulations promulgated by the Department of Education that used a school's student loan default rate "for each of the three most recent fiscal years" in order to determine the school's future eligibility for the Department's Guaranteed Student Loan ("GSL") program. *Id.* at 860. The court rejected plaintiffs' challenge to the regulations, concluding that the regulations simply require the Department "to look at schools' past default rates in determining future eligibility . . . . We regard this requirement as no different in substance than a lender's rule against extending credit to applicants with negative credit histories. Several cases have established that such a requirement does not operate retroactively." *Id.* at 865.

The DRS rule fits squarely within this line of cases. The DRS requires the Secretary to look at Head Start grantees' history of deficiency findings in order to determine the grantees' future eligibility for automatic renewal of their grants. The fact that the deficiency findings were made *before* the DRS regulations went into effect is of no moment; antecedent facts may be used to determine future eligibility. *Ass'n of Private Colleges & Univ. v. Duncan*, No. 11-1314, 2012 WL

2505237, at *13 (D.D.C. June 30, 2012) (finding "debt measure[s] [that] look to the recent performance of a program's former students in order to determine whether that program will, in the future, be eligible to receive Title IV funds," were not retroactive).  The DRS regulations do not operate retroactively, thus the Court need not determine whether any retroactive effect was authorized by Congress.  Plaintiffs' attempt to distinguish *Cosmetology Schools* misses the mark. Plaintiffs correctly point out that a "regulation that manifests 'primary' or 'direct' retroactivity is per se impermissible under the APA absent specific authorization."  Pls.' Reply at 3.  But the D.C. Circuit's reasoning in *Cosmetology Schools* demonstrates that the DRS is not retroactive at all, primarily or secondarily.  Therefore, the issue of whether or not Congress authorized the Secretary to engage in retroactive rulemaking in this case is irrelevant.

### 2.    Plaintiffs' Proposed Approaches to Retroactivity

Plaintiffs rely on two sets of cases to support their retroactivity argument: *St. Cyr/Vartelas* and *Koch/Sacks*, but both are inapposite to the situation at hand.  Plaintiffs rely heavily on two Supreme Court cases concerning immigration issues: *Immigration & Naturalization Service v. St. Cyr*, 533 U.S. 289 (2001); and *Vartelas v. Holder*, 132 S. Ct. 1479 (2012).  In *St. Cyr*, the petitioner, a lawful permanent resident, pled guilty to an aggravated felony in 1996, at which time he could have applied for a discretionary waiver of deportation if he entered removal proceedings.  *St. Cyr*, 533 U.S. at 293.  Following his guilty plea, Congress amended the Immigrant and Nationality Act (hereinafter referred to as the "1996 Amendments") making the petitioner ineligible for a waiver of deportation when removal proceedings commenced against him in 1997.  *Id.*  Finding no authorization for retroactivity in the statute, the Court held the 1996 Amendments could not be applied to individuals who pled guilty prior to the amendments, and the discretionary waiver of deportation remained available for those who would have been eligible under the law in effect at the

15

time of their pleas.  *Id.*  Petitioner Vartelas, also a lawful permanent resident, pled guilty to a felony

in 1994.  *Vartelas*, 132 S. Ct. at 1483.  Prior to 1996, Vartelas (and similarly situated lawful

permanent residents) could travel abroad for brief periods without losing his immigration status.  *Id.*

As part of the 1996 Amendments, Congress amended the law making lawful permanent residents

with relevant convictions removable if they travel abroad.  *Id.*  In 2003, Vartelas briefly traveled to

Greece, and upon his return, was classified as inadmissible and placed into removal proceedings.  *Id.*

The Supreme Court held that applying the 1996 Amendments on this issue to Vartelas was

impermissibly retroactive.  *Id.* at 1484, 1492.

      The difference between *St. Cyr/Vartelas* and *Cosmetology Schools*, *Shalala, Bell Atlantic*,

and every other case that has held regulations may use antecedent information in making future

decisions lies in the notion of imposing a "liability" versus denying an individual a future "benefit."

In *St. Cyr* and *Vartelas*, the petitioners faced additional civil liability in the form of deportation for

past conduct (i.e., a guilty plea).  The legislation in question in both cases attached new legal

obligations "enforceable by civil remedy or criminal conduct" to the petitioners' guilty pleas.

Black's Law Dictionary 932 (8th Ed. 2004).  Similarly in *Landgraf v. USI Film Products*, 511 U.S.

244 (1994), the Court found the provision of the Civil Rights Act of 1991 creating the right to

recover compensatory and punitive damages for certain claims under Title VII, did not apply to

cases pending at the time the statute was enacted.  *Id.* at 280-81.  In this case, the DRS denies

Plaintiffs the prospective *benefit* of automatic renewal, but does not terminate their current grants, or

attach some new civil liability to the prior deficiency finding.  The DRS is analogous to the future

eligibility in the GSL program, future rate caps, and future reimbursement rates, all of which may be

based on antecedent data without being considered retroactive.  Despite its use of past data to

16

determine future eligibility for automatic renewal of Head Start grants, the DRS is not a retroactive rule.

Second, the Ninth Circuit in *Koch v. Securities & Exchange Commission*, 177 F.3d 784 (9th Cir. 1999), held the SEC could not retroactively apply provisions of the Penny Stock Reform Act to bar Koch from trading in penny stocks for life based on misconduct that occurred before the passage of the act. *Id.* at 788-89. In finding the statute would have a retroactive effect if applied to Koch, the Ninth Circuit relied on the fact the statute granted the SEC new enforcement powers it previously did not have. *Id.* The application of the new penalty provision to Koch based on pre-enactment misconduct was thus impermissible according to the court. *Id.* Relying entirely on *Koch*, the Ninth Circuit in *Sacks v. Securities & Exchange Commission*, 648 F.3d 945 (9th Cir. 2011), also prevented the SEC from applying a regulation barring Sacks from representing parties in securities-related arbitration based on the fact he was banned from the securities industry prior to the enactment of the rule. *Id.* at 952-53.

Under this same logic, the DRS regulations are not retroactive. Congress authorized the Secretary to designate grantees for renewal as of June 12, 2009. The conduct on which the designation is based took place after that date—that is, the date on which the Secretary had the authority to make the designation—but before the effective date of the regulation. Accordingly, this case is more akin to *Securities & Exchange Commission v. First Pacific Bancorp*, 142 F.3d 1186 (9th Cir. 1998), in which the court found a statute was not impermissibly retroactive because it "merely codified the equitable authority" the SEC already possessed. The DRS regulations codified

the authority Congress granted to the Secretary in the 2007 Reauthorization, and pursuant to *Koch/Sacks*, are not retroactive.[3]

        B.        *The DRS does not Violate Plaintiffs' Due Process Rights*

Plaintiffs' second overall challenge to the DRS alleges the system is unconstitutional because it divests them of protected property and liberty interests without due process of law.  In order to establish this claim, the Plaintiffs must show (1) they have a protected property or liberty interest in automatic renewal of their Head Start grants; and (2) HHS does not provide sufficient due process before requiring Head Start agencies to compete for new grants.  *See Tarpeh-Doe v. United States*, 904 F.2d 719, 722 (D.C. Cir. 1990).  As explained below, the Plaintiffs fail to prove either aspect of their due process claim.

        1.       <u>Plaintiffs Failed to Identify Any Protected Property or Liberty Interest</u>

"The Supreme Court has stated that individuals asserting a constitutional right to certain procedures must demonstrate that they have been deprived of a protected liberty or property interest." *Tarpeh-Doe*, 904 F.2d at 722.  Protected interests are limited to those "to which a claimant has a legitimate entitlement; a mere expectancy grounded in 'an abstract need or desire' is insufficient to trigger the protections of the due process clause." *Id.* (quoting *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972)).  Plaintiffs assert both its protected property and liberty interests are implicated by the DRS rule.  The Court analyzes each in turn.

---

    [3]  This is not to say the Court necessarily agrees with the Ninth Circuit's approach; rather, even if the Court were to adopt the Ninth Circuit's retroactivity analysis, the outcome in this case would not change.

a.      Property Interests.

Plaintiffs initially argue that they have a protected property right to automatic renewal of

their status as Head Start grantees.  Protected property interests, for due process purposes, "may

derive from statutes and regulations restricting the exercise of official discretion." *Tarpeh-Doe*, 904

F.2d at 722.  As the D.C. Circuit explained:

> Whether a given statutory scheme gives rise to a protected interest depends on
> whether the authority promulgating the statute or regulation has placed *substantive*
> limits on official discretion.  Addressing the limitations necessary to support such an
> entitlement, the Court has stated that "the regulations [must] contain 'explicitly
> mandatory language,' *i.e.*, specific directives to the decisionmaker that if the
> regulations' substantive predicates are present, a particular outcome must follow."

*Id.* at 722-23 (quoting *Ky. Dep't of Corrections v. Thompson*, 490 U.S. 454, 463 (1989)) (internal

citation omitted).  Plaintiffs contend the 2007 Reauthorization substantively limited the Secretary's

discretion, requiring that Head Start grants be automatically renewed if the grantee (1) satisfies its

obligation under the Head Start rules and regulations; and (2) the grantee provides "high quality and

comprehensive" Head Start services.[4]  Pls.' Mot. at 33.

Assuming the language in the 2007 Reauthorization was sufficient to create the entitlement

as articulated by the Plaintiffs, that is only half the battle.  Although the statute arguably restricts the

Secretary's discretion to deny grants once the grantee shows it provides "high quality and

comprehensive" services, Plaintiffs do not argue that Congress provided sufficient substantive limits

on the Secretary's discretion to determine which grantees are in fact providing high quality and

comprehensive services.   In other words, the statute does not provide sufficient substantive

_____

[4]  Because it is irrelevant to the Court's disposition of this claim, the Court does not address
the premise of Plaintiffs' argument that prior to the 2007 Reauthorization, Head Start grantees had a
protected property interest in automatic renewal of Head Start grants so long as the grantee complied
with the "terms and conditions of the award."  Pls.' Mot. at 32.

limitations on the Secretary's discretion to determine *who* provides "high quality and comprehensive services" such that Plaintiffs can claim entitlement to continued classification as a high quality provider and thus entitled to automatic renewal of their Head Start grants.

The *Continental Training Services, Inc. v. Cavazos*, 893 F.2d 877 (7th Cir. 1990) case, on which the Plaintiffs rely, is instructive on this point. In *Continental*, the plaintiff asserted it had a protected property interest in its eligibility to receive federal student financial aid under the Higher Education Act ("HEA"). *Id.* at 879. The Seventh Circuit, echoing *Tarpeh-Doe*, noted that "where the statutory program plan contains extensive discussion of certification or eligibility requirements and procedures for granting or revoking certification or eligibility, it is difficult to conclude that there are no 'rules or mutually explicit understandings' supporting the providers' claims of entitlement to certification or eligibility status." *Id.* at 893 (quoting *Perry v. Sinderman*, 408 U.S. 593, 601 (1972)) (internal citation omitted). The HEA itself prescribed, in great detail, the eligibility requirements to receive federal student final aid. 20 U.S.C. § 1094(a) (outlining twenty-nine separate eligibility requirements). Accordingly, the court found "[t]he eligibility standards in the HEA provide the sort of 'substantive predicate' the courts have required before finding that property interests exist." *Continental*, 893 F.2d at 893. By contrast, in this case, Congress delegated to the Secretary the authority to determine the precise standards for "high quality and comprehensive" Head Start services. There simply was no "mutually explicit understanding" in the 2007 Reauthorization regarding high quality services; it was not until the Secretary promulgated the Final Rule that such an understanding could have existed. Congress provided the Secretary broad discretion to define who is an eligible provider of high quality services, therefore Plaintiffs' do not have a protected property interest in automatic renewal of their grants.

The procedural history of the DRS demonstrates that Plaintiffs' reliance on *Sinderman* is misplaced.  In *Sinderman*, the Court found that a college professor may be able to show a protected interest in job tenure, despite no formal tenure provision in his contract.  *Id.* at 602.  The Court noted that despite the lack of a formal tenure policy, "the respondent has alleged the existence of rules and understandings, promulgated and fostered by state officials, that may justify his legitimate claim of entitlement to continued employment absent 'sufficient cause.'"  *Id.* at 602-03.  In other words, although no formal tenure policy was in place, the respondent may be able to prove long standing practice, as confirmed by state officials, entitled him to receive tenure.

Plaintiffs cannot make a similar showing of de facto entitlement in this case.  Congress upset any expectation of automatic renewal of Head Start grants with the 2007 Reauthorization, which rejected the old system in favor of competition for some and automatic renewal of grants for others.  The only informal policy or practice mentioned by either party between the effective date of the 2007 Reauthorization and the implementation of the DRS is the proposed DRS rule.  Plaintiffs cannot credibly argue the proposed DRS rule confirmed or created any entitlement to automatic renewal of Head Start grants.  Absent any formal or informal grounds on which to base its purported entitlement to automatic renewal of Head Start grants, the Plaintiffs have no protected property interest, and thus are not entitled to any (additional) process.

b.     Liberty Interests.

The Plaintiffs also contend that the DRS regulations threaten protected liberty interests insofar as designation for re-competition "stigmatizes [the] entity and concretely impairs its ability to pursue business opportunities."  Pls.' Mot. at 33.  "[I]nterest in reputation alone which [Plaintiffs] seek[] to vindicate in this action . . . is quite different from the 'liberty' or 'property' recognized" in cases wherein "a right or status previously recognized . . . was distinctly altered or extinguished."

*Paul v. Davis*, 424 U.S. 693, 711-12 (1976).  Federal law "does not extend to [Plaintiffs] any legal guarantee of present enjoyment of reputation which has been altered as a result of [the Secretary's] actions."  *Id.*  Any harm or injury to Plaintiffs' reputation does not result in a deprivation of any liberty or property protected against deprivation without due process of law.  *Id.* at 712.

Consistent with *Davis*, the D.C. Circuit applies a "stigma-plus framework" to claims like Plaintiffs', "requiring plaintiffs to show that the alleged reputational harm *completely* destroys the value of their property."  *Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 121 (D.C. Cir. 2010).   General economic harm from damage to a parties' "reputation" is not a protected liberty or property interest.  *E.g.*, *Jackson*, 610 F.3d at 121 (finding plaintiff did not have a protected interest in its reputation, even where reputational damage purportedly led the market to "devalue[] its stock, brand, and credit rating").  For example, in *Old Dominion Dairy Products, Inc. v. Secretary of Defense*, 631 F.2d 953 (D.C. Cir. 1980), the court found the plaintiff had a protected liberty interest in its business reputation insofar as the government's label that the plaintiff "lacked integrity" caused a "sudden loss of Government work [that] effectively put Old Dominion out of business."  *Id.* at 963. Plaintiffs' evidence falls short of this standard.  The Plaintiffs' vague claim that designation under the DRS "concretely impairs [their] ability to pursue business opportunities," Pls.' Mot. at 33, does not demonstrate that the designation label effectively puts Plaintiffs out of business.  Nor does the record support this assertion.  Samuel Bass, the Executive Director of the Chesterfield-Marlboro Economic Opportunity Council, avers only that transactions to purchase two new facilities "may be in jeopardy."  Decl. of S. Bass, ECF No. [16-4], ¶ 43.  Mattie James, the President and CEO of Child Development Council of Franklin County offers only speculation as to what might happen because the organization "can't plan properly for the future" absent a guaranteed renewal of their Head Start Grant.  Decl. of M. James, ECF No. [16-12], ¶ 34.  Moreover, most of the consequences the

Plaintiffs discuss—staff layoffs, reduction of services, etc.---arise from the non-renewal of the grant itself, *not* from the stigma associated with having to compete.  *Id.* at ¶¶ 35-36; Bass Decl. ¶ 46.  In other words, Plaintiffs failed to identify any concrete and substantial harm from the stigma of being placed on the competition list that would create a protected liberty interest for due process purposes.

At various points throughout their pleadings, the Plaintiffs assert that the DRS also impairs their protected interests by requiring grantees to "recompete at a substantial—if not fatal—disadvantage vis-à-vis other applicants in the process."  Pls.' Mot. at 34.  Plaintiffs cite two separate provisions of the statute: (1) Section 9836(c), which outlines the DRS; and (2) Section 9836(d)(3), which provides that in designating a Head Start agency for a geographic area in which no grantees received automatic renewal of their grants, the Secretary should provide priority to certain qualified applicants.  Plaintiffs contend that the substantive requirements of both sections are essentially identical, thus any Head Start agency forced to compete for a grant cannot receive priority status for any open grants.  *See* Pls.' Mot. at 8-9, Pls.' Reply at 3 n.1.  This argument fails because the statutory sections referenced by the Plaintiffs employ similar, but distinct standards.  In terms of identifying grantees for purposes of the DRS, the statute refers to those grantees providing "high-quality and comprehensive Head Start programs."  42 U.S.C. § 9836(c)(8); *accord id.* § 9836(c)(6) (referencing grantees "successfully delivering a high-quality and comprehensive Head Start program").  By contrast, in the context of awarding priority to certain applicants for open grants, the statute refers to the applicant's "demonstrated capacity in providing effective, comprehensive, and well-coordinated early childhood education and development services and programs to children and their families."  *Id.* § 9836(d)(3).  Facially, these are different standards.   Nothing precludes the Secretary from making the determination under 42 U.S.C. § 9836(d)(3) that the an applicant who had one or more deficiencies in the previous grant term, has a demonstrated capacity to provide the

necessary level of services.  There is simply no support for this argument in the record, and, as the Defendants note, previous deficiency findings historically have not barred grantees from being designated as Head Start agencies for open grants.  Defs.' Reply at 8 n.6.

At the point the DRS prevents automatic renewal of Plaintiffs' grants but does not terminate current grants, the DRS does not impair any protected rights.  In *Boniface*, the petitioner challenged regulations promulgated by the Transportation Security Administration governing the approval of applications for hazardous material endorsements for commercial drivers' licenses.  613 F.3d at 284. In 2007, TSA adopted a rebuttable presumption that an applicant was a security risk if the applicant had been convicted of any "disqualifying criminal offenses."  *Id.*  The petitioner challenged the presumption as impermissibly retroactive insofar as TSA denied the petitioner's application to renew his endorsement because of petitioner's 1975 conviction for possession of an unregistered explosive device.  *Id.* at 285.  The D.C. Circuit held that the regulations did not "impair rights [petitioner] possessed when he acted, increase [his] liability for past conduct, or impose new duties with respect to transactions already completed," because "the presumption is nonetheless rebuttable and the disqualification hence merely provisional."  *Id.* at 288 (internal quotations omitted).  Likewise here, prior deficiency findings do not bar Plaintiffs from receiving future Head Start grants, they simply require Plaintiffs to reapply for future grants.  Ultimately, Plaintiffs failed to identify any protected liberty or property interest triggering due process protections.

### 2.    Defendants Provide Sufficient Due Process Before Deprivation

Even if the Plaintiffs had shown a protected interest for due process purposes, Plaintiffs must also show Defendants do not provide adequate procedural protections before depriving Plaintiffs of that protected interest.  Plaintiffs contend that the DRS fails to provide adequate due process before depriving Plaintiffs of their right to automatic renewal of their grants because (1) "Grantees found to

have deficiencies have not in the past – and do not currently have – any ability to seek review of deficiency determinations within HHS"; and (2) HHS does not provide any avenue of appeal for designation renewal determinations.  Pls.' Mot. at 34-35.

"Due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to the time, place and circumstances. . . . Due process is flexible and calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (internal quotation marks and citations omitted).

> In response to the question what process is due, the Supreme Court has established a general rule that individuals must receive notice and an opportunity to be heard before the Government deprives them of property.  Due process, while flexible and determined by the particular circumstances of each situation, requires, at a minimum, an opportunity to be heard at a meaningful time and in a meaningful manner.

*UDC Chairs Chapter, Am. Ass'n of Univ. Professors v. Bd. of Trustees of the Univ. of D.C.*, 56 F.3d 1469, 1472 (D.C. Cir. 1995) (internal quotations and citations omitted).  In striking the appropriate balance of procedures, the Court must consider "the degree of potential deprivation that may be created by a particular decision," "the fairness and reliability of the existing pretermination procedures, and the probable value, if any, of additional procedural safeguards," and "the public interest . . . includ[ing] the administrative burden and other societal costs that would be associated with requiring, as a matter of constitutional right," additional procedural safeguards. *Eldridge*, 424 U.S. at 341, 343, 347.

Although Plaintiffs lament the lack of *any* "avenue for appeal" of deficiency determinations, Plaintiffs overlook the process provided to Head Start grantees *before* a deficiency determination is actually made.  The undisputed evidence in the record indicates that when on-site review teams identify potential deficiencies, the teams offer officials of Head Start an opportunity to respond. *E.g.*, A.R. 01604 (Overview of Findings, Council for Economic Opportunities); A.R. 01617-18

(Notice of Deficiency Requiring Immediate Correction, Ashtabula Cnty. Cmty. Action Agency). HHS provides grantees notice that the review identified potential issues, and offers the grantees a second opportunity to provide additional information to the OHS and ACF experts charged with determining whether or not to issue a deficiency determination.  A.R. 03332 (DRS Final Rule). Finally, once a deficiency finding is issued, a Head Start agency can refuse to correct the deficiency and challenge the finding before the Departmental Board of Appeals, if and when, HHS initiates termination proceedings.  42 U.S.C. § 9836a(e)(1)(C); A.R. 03331.  However, if the agency elects to correct the deficiency as identified by HHS, it will not lose its current Head Start grant.  Admittedly, if a Head Start agency self-reports a violation, it is not clear whether OHS/ACF provides the reporting agency with an additional opportunity to present information after the initial report; it appears that in at least some cases, OHS/ACF performs additional fact gathering before issuing a determination based on self-reported violations, *see* A.R. 00935 (Notice of Deficiency, Miami Valley Child Dev. Ctrs.); A.R. 01614 (same), but this practice does not appear to be universal. Examined through the lens of the *Eldridge* factors, on balance, the Court finds these procedures provide sufficient due process to Head Start agencies before the agencies are required to compete for new grants.

First, the Court must consider "the degree of potential deprivation." *Eldridge*, 424 U.S. at 341.  "This factor looks to the level of suffering that an individual will undergo as a result of the state action.  The greater the potential suffering, the greater the need for a [additional safeguards]." *Chernin v. Welchans*, 844 F.2d 322, 326 (6th Cir. 1988).  Despite Plaintiffs' doomsday predictions regarding their future ability to obtain Head Start grants, the only concrete harm on the record Plaintiffs face from erroneous deprivation is the marginal cost associated with the paperwork to apply for the next grant cycle.  Even if the Plaintiffs' predictions are correct, and the designation will

significantly impair an agencies' ability to obtain a grant in the future, *but see supra* at Section

IV.B.1.b, in light of the low risk of *erroneous* deprivation, additional procedures are not required.

Second, the Court looks to the "fairness and reliability" of existing procedures. *Eldridge*,

424 U.S. at 343. Based on the evidence provided by the parties, the Court finds the current

procedures employed by the Defendants to be both fair and reliable. Deficiency determinations for

six of the Head Start agencies cited in the administrative record concern health and safety issues,

including (1) releasing a child to an unauthorized individual, A.R. 00934; (2) leaving a child on a

bus and then unattended in a restaurant parking lot; A.R. 01613; (3) metal screws projecting from

fence posts, two feet of standing water in accessible drains, and broken glass on playgrounds, A.R.

01600; (4) physical and verbal abuse by a teacher, A.R. 01616; (5) leaving a child on a bus in the

bus garage for two hours, A.R. 01619; (6) leaving two toddlers unsupervised outside of a fenced-in

play area, A.R. 01621; and (7) dropping off a four-year old at her house with no one home, A.R.

01752. *Accord* Decl. of P. Cole, ECF No. [16-13], ¶¶ 13-14 (noting one Head Start agency received

a deficiency finding for warped playground tiles that caused a child to trip); Decl. of P. Bronder-

Giroux, ECF No. [16-9], Attach. 1 (identifying deficiencies for eight-foot gaps in playground

fencing leading to a two lane road and a natural gas leak in a classroom). The example of a non-

safety related deficiency cited by the Plaintiffs involved the purchase of $42,500 in gift cards as

Christmas gifts for agency employees. Pls.' Mot. at 22; James Decl., Attach. 1. Careful

examination of the record reveals that the Plaintiffs and their member agencies do not take issue

with Defendants' fact finding or accuracy of the notices of particular deficiencies. Rather, the

Plaintiffs dispute whether or not particular incidents are severe enough to qualify as "material"

failures under the Head Start Act. Decl. of M. Burns, ECF No. [16-10], ¶¶ 22-23; Bass Decl. ¶¶ 37-

38; James Decl. ¶ 23.

With the real nature of the conflict in focus, two points become clear.  One, Plaintiffs'
contention that these events do not demonstrate *systemic* failures ignores the statutory definition of a
"deficiency," which includes either "systemic" *or* "substantial" material failures in the area of
health, safety, or the misuse of funds.  42 U.S.C. § 9832(2)(A)(i), (iv).  The Defendants'
determination that leaving children unattended in a variety of circumstances, natural gas leaks in
classrooms, and other issues are "material" failures is reasonable.  Two, since the Plaintiffs seek an
additional hearing solely for the purpose of disputing Defendants' legal interpretation of the statute,
there is minimal likelihood that additional process will increase the fairness or reliability of the
process.  The current procedures are only "unfair" or "unreliable" insofar as the parties have
competing interpretations of the statute, which does not warrant additional procedural safeguards.
*See Tate v. District of Columbia*, 627 F.3d 904, 908-09 (D.C. Cir. 2010) (rejecting appellant's due
process challenge where "Tate does not challenge the adequacy of the administrative hearings
themselves").

Third, the Court examines the "administrative burden and other societal costs" that would
accompany additional safeguards.  *Eldridge*, 424 U.S. at 347.  In the context of on-site reviews, the
administrative cost of allowing Head Start agencies to appeal the deficiency determinations is
excessive in light of the fact such agencies have two opportunities to contest the findings before they
are even issued, and there is no indication the Secretary's determinations are factually unfair or
unreliable.  Two opportunities to present information before a fair and reliable determination and an
informal opportunity to appeal final determinations is adequate process for the interests in question.

For purposes of self-reported violations, the administrative burden of an appellate process is
unwarranted in light of the fact the Head Start agency itself controls the information on which the
deficiency finding is based.  Even if HHS does not routinely conduct any follow-up investigation

into self-reported incidents, the agency itself is able to provide the relevant factual information in the initial report. Plaintiffs fail to show that an appellate process would reveal any additional information that might alter the deficiency finding. Once again, the heart of Plaintiffs' complaint as to deficiency findings based on self-reported violation lies in the Defendants' interpretation of the statute. Additional due process is not constitutionally required simply because the Plaintiffs do not agree with how a federal agency elects to interpret a statute.

C.       The Designation Renewal System is Neither Arbitrary Nor Capricious

Plaintiffs' final challenge to the DRS alleges the Secretary adopted an impermissible interpretation of the 2007 Reauthorization statute by including the single deficiency trigger. "As a general matter, an agency's interpretation of the statute which that agency administers is entitled to *Chevron* deference." *Fox v. Clinton*, No. 11-5010, 2012 WL 2094410, at *9 (D.C. Cir. June 12, 2012) (citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837 (1984)). In the first step, the Court reviews the statute *de novo* to determine whether or not the statute is ambiguous. *Id.* at 842-43. If the statute is ambiguous, the Court then must defer to the agency's interpretation of the statute unless it is "manifestly contrary to the statute." *Id.* at 844. However, the Court's analysis does not end with *Chevron*:

> Even where an agency's construction satisfies *Chevron*, [the court] still must ensure that [the agency's] action is not otherwise arbitrary and capricious. The agency must have provided a rational connection between the facts found and the choice made and its explanation must not run[] counter to the evidence before the agency, or [be] so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Int'l Union, United Mine Workers of Am. v. Mine Safety and Health Admin.*, 626 F.3d 84, 90 (D.C. Cir. 2010) (internal quotations and citations omitted) (alterations in original). An agency's decision may be arbitrary or capricious if any of the following apply: (i) its explanation runs counter to the

29

evidence before the agency or is so implausible that it could not be ascribed to a difference of view or the product of agency expertise; (ii) the agency entirely failed to consider an important aspect of the problem or issue; (iii) the agency relied on factors which Congress did not intend the agency to consider; or (iv) the decision otherwise constitutes a clear error of judgment. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *accord Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1118 (D.C. Cir. 2010).  This standard of review is highly deferential to the agency; a court need not find that the agency's decision is "the only reasonable one, or even that it is the result [the court] would have reached had the question arisen in the first instance in judicial proceedings." *Am. Paper Inst., Inc. v. Am. Elec. Power Serv. Corp.*, 461 U.S. 402, 422 (1983).  Plaintiffs, as the party challenging the agency action, bear the burden of proof.  *Abington Crest Nursing & Rehab. Ctr. v. Sebelius*, 575 F.3d 717, 722 (D.C. Cir. 2009) (citing *City of Olmsted Falls v. Fed. Aviation Admin.*, 292 F.3d 261, 271 (D.C. Cir. 2002)).  In assessing the merits of Plaintiffs' challenge, the Court begins with the presumption that the Secretary's action was valid.  *Grid Radio v. Fed. Commc'ns Comm'n*, 278 F.3d 1314, 1322 (D.C. Cir. 2002).

The first question under the *Chevron* rubric is "whether Congress has directly spoken to the precise question at issue."  *Chevron*, 467 U.S. at 842.  In this case, the dispute is not whether or not the 2007 Reauthorization of Head Start authorized the Secretary to promulgate the DRS regulations at all; the statute plainly instructed this action.  42 U.S.C. § 9836(c).  Rather, the relevant question is whether the 2007 authorization is ambiguous as to the Secretary's authority to interpret the statute to create the single deficiency trigger.  *Am. Fed'n of Gov't Employees, AFL-CIO, Local 446 v. Nicholson*, 475 F.3d 341, 345-46 (D.C. Cir. 2007).  Thus, the inquiry for the Court is under the second step of *Chevron*—whether the Secretary's interpretation of Congress' instructions is

reasonable.  The Court's inquiry under the second step of *Chevron* "overlaps with [the Court's] inquiry under the arbitrary and capricious standard." *Id.* at 346.  "Whether a statute is unreasonably interpreted is close analytically to the issue whether [sic] an agency's actions under a statute are unreasonable." *Gen. Instrument Corp. v. Fed. Commc'ns Comm'n*, 213 F.3d 724, 732 (D.C. Cir. 2000).

1.     The DRS System is Reasonable in Light of Congress' Intent

For the first time in their Reply, Plaintiffs contend that "Congress explicitly foreclosed the course of action that Defendants have taken, and thus limited the extent of the delegation of rulemaking authority to HHS." Pls.' Reply at 18.  Citing the report from the House Committee on Education and Labor, Plaintiffs contend that "Defendants' adoption of the 'single deficiency trigger' is unlawful under the first step of the Chevron analysis." *Id.* at 19.  As an initial matter, even if Congress expressly forbade the Secretary from using a single deficiency trigger, that would go to the question of whether or not the Secretary's overall interpretation of the directive to promulgate a designation system was reasonable, the second step of the Court's *Chevron* analysis. *Nicholson*, 475 F.3d at 346.  More to the point, the House Committee report betrays Plaintiffs' assertion that Congress "explicitly foreclosed" that single deficiency trigger.  The report "strongly encourage[d] the expert panel and the Secretary" to use on-site reviews "more thoughtfully than simply tabulating whether a grantee has been deemed deficient or not."  H.R. Rep. No. 110-67, at 60 (2007); *id.* ("[T]he Committee encourages the panel to use the data cautiously and wisely.").  However, at no point did the House Committee, or more importantly Congress as a whole, "foreclose" the Secretary from adopting a single-deficiency trigger.

Plaintiffs also argue that the single deficiency trigger is arbitrary and capricious because corrected deficiencies that occurred up to five years before the competitive cycle are not reflective of

the agency's current capacity to provide high-quality and comprehensive services. Noting that the statute directs the Secretary to determine "if a Head Start agency *is* delivering a high-quality and comprehensive Head Start program," 42 U.S.C. § 9836(c)(1), Plaintiffs contend past data cannot be considered in making what is phrased in the statute as a present-tense determination. Pls.' Mot. at 36-37. Plaintiffs' hyper-technical reading of the statute overlooks Congress' express instruction to the Secretary to base the DRS on historical data, including triennial reviews. 42 U.S.C. § 9836(c)(1)(B). The Plaintiffs further note that Congress recognized the on-site monitoring process was flawed, and thus it is unreasonable for the Secretary to rely on flawed reviews in designating grantees to compete. However, Congress explicitly required the Secretary to consider program reviews in constructing the DRS rule. *Id.* Moreover, Congress amended both the review process and the definition of "deficiency" as part of the 2007 Reauthorization, strengthening the system and mitigating the issues that led to the Committee's criticism of the review process. *Id.* § 9836a(c)(1); H.R. Rep. No. 110-67, at 61-62 (2007). Additionally, the criticism from Congress that deficiency findings did not identify all low-performing grantees does not in isolation make the use of a single deficiency trigger arbitrary or capricious. Under-inclusiveness by one factor is less significant in light of the six other criteria that will also trigger competition by low performing grantees.

Plaintiffs next argue that the single deficiency trigger is unreasonable because deficiency findings are unreviewable. As noted *supra*, Section IV.B.2, the Secretary provides Head Start agencies with constitutionally sufficient procedural safeguards before issuing deficiency findings. The Court does not mean to imply that the constitutional minimum is never arbitrary and capricious; rather in this case, Plaintiffs have not identified any flaws in the deficiency finding procedures outside those discussed and dispelled above. Accordingly, it is not unreasonable for the Secretary to rely on deficiency findings as part of the DRS rule.

Finally, Plaintiffs contend that the single deficiency trigger is arbitrary and capricious because the Defendants do not correctly apply the statutory definition of "deficiency." Pls.' Mot. at 38. Plaintiffs note that the definition of "deficiency" in the relevant regulations, 45 C.F.R. § 1304.3(a)(6), does not track verbatim the definition included in the 2007 Reauthorization. *Id.* Plaintiffs' argument is misleading. Prior to the 2007 Reauthorization, the Head Start Act did not define "deficiency." The Secretary promulgated the regulation defining deficiency to fill that gap. When Congress passed the 2007 Reauthorization, the statute overrode the regulatory definition to the extent the two are inconsistent. However, there is no indication the Defendants have applied the now obsolete regulatory definition since the effective date of the 2007 Reauthorization. In fact, the notices of deficiency determinations in the Administrative Record cite to the statutory definition of deficiency. *E.g.*, A.R. 01592 (citing Head Start Act Section 637(2)(C), 42 U.S.C. § 9832(2)(C)); A.R. 01603 (citing Head Start Act Section 637(2)(A)(i), 42 U.S.C. § 9832(2)(A)(i)); A.R. 01619 (same). For the reasons stated *supra*, the evidence in the record fails to show Defendants are inappropriately applying this standard. Thus, it is neither arbitrary nor capricious for the Secretary to rely on deficiency findings as part of the DRS rule.

> 2.   The Secretary Provided a Clear Rationale for Departing from the Expert Panel's Recommendations

Although Congress instructed the Secretary to convene an expert panel and consider its recommendations, Congress did not constrain the Secretary to promulgating the exact DRS rule recommended by the panel. Rather, Congress required the Secretary to consider the Advisory Committee's recommendations, and to provide a "clear rationale" for any differences between the proposed designation system and the panel's recommendations. 42 U.S.C. § 9836(c)(10)(B). The proposed (and final) DRS utilized a single deficiency trigger rather than a number of deficiencies

two standard deviations from the mean.  To justify this departure, the Secretary explained that the proposed system utilized a single deficiency trigger because it (1) was simple, transparent, and fair; and (2) can be applied uniformly for all grantees.  A.R. 03257.  The standard deviation approach would amount to a different numerical trigger "for each cohort of grantees reviewed, as well as for each review cycle, since not all grantees will be reviewed simultaneously."  *Id.*

Plaintiffs object to the Secretary's explanation, and argue that "HHS provided no cogent explanation of its reasons for ignoring the expert panel's recommendation that the DRS consider whether an awardee had deficiencies "far more than the average grantee."[5]  Pls.' Mot. at 41. Plaintiffs specifically challenge the Secretary's explanation on the grounds (1) it "obscures the key legal distinction between corrected and uncorrected deficiencies"; (2) "[t]he panel by no means condoned using a single deficiency finding as an automatic trigger"; and (3) the Defendants used a cohort-based approach for one of the other competition triggers.  Pls.' Mot. at 42.  None of these arguments is persuasive.

First, Plaintiffs' contention that the Secretary's reliance on deficiencies ignores the distinction between corrected and uncorrected deficiencies is irrelevant.  The only way for the Secretary to consider deficiencies—as recommended by the panel and Congress—was to consider corrected deficiencies because, as Plaintiffs point out, grantees with uncorrected deficiencies are terminated.  Moreover, Plaintiffs' emphasis on the fact that the deficiencies triggering competition are "corrected" ignores Defendants' point that deficiencies are significant failures such that their

---

[5]  The Court notes the specific recommendation of the panel was that any grantee with a number of deficiencies at least two standard deviations from the norm should be required to compete.  A.R. 00350 (Dec. 2008 Advisory Comm. Final Report).

occurrence at all, even if later corrected, is relevant to the determination as to whether the grantee is providing high-quality services.

Second, the fact that the Advisory Committee did not recommend a single deficiency trigger does not necessarily mean the Secretary's explanation for adopting the single deficiency trigger is unclear or inadequate.  The Committee recognized the importance and utility of deficiency findings; the approaches recommended by the Committee and ultimately taken by the Secretary simply reflect different paths towards the same goal.  The Committee did not explicitly reject the single deficiency trigger, nor did it identify any significant harm that might accompany this criterion.  In addition, the record indicates that the single deficiency trigger is not, quantitatively speaking, a significant departure from the Committee's recommendation.   By the Court's calculation, two standard deviations from the mean in Fiscal Year 2010 equaled 2.48 deficiency findings.  *See* A.R. 01869-01905.  The Administrative Record includes similar findings for other Fiscal Years.  *E.g.*, A.R. 2992 (finding two standard deviations equal 2.12 deficiency findings); A.R. 3051 (finding two standard deviations equal 2.38 deficiency findings).  The Secretary's justification for her departure from the Committee's recommendation appears even more reasonable given that the single deficiency trigger is quantitatively similar to the standard proposed by the Committee.  The Court cannot find the Defendants' explanation of their proposal was insufficient simply because the Committee itself did not recommend a single deficiency trigger.

Third, Plaintiffs take issue with the Secretary's seeming contradiction in disavowing a cohort approach with regards to deficiencies, but adopting a cohort standard in the context of CLASS: Pre-K evaluations.  The criteria simply are not comparable.  The Classroom Assessment Scoring System ("CLASS") is a relatively new tool used to monitor classroom performance.  A.R. 00351-52.  As such, the Defendants are still in the process of implementing the system and determining the

appropriate threshold for low versus high quality providers. *Id.* The Court is not in a position to second guess the Defendants' policy judgment that in the context of CLASS data, the cohort approach was a more appropriate and fair method than simply setting a blanket cut-off score to require competition.

Overall, the Court finds the Secretary complied with Congress' directive as to the procedure for promulgating the DRS rule, and provided a clear and coherent rationale for departing from the Advisory Committees recommendation regarding the use of deficiency findings. The case cited by the Plaintiff, *National Constructors Ass'n v. Marshal*, 581 F.2d 960 (D.C. Cir. 1978), is inapposite. The *National Constructors* case concerned the process the Occupational Safety and Health Administration ("OSHA") was required to follow by statute in promulgating certain types of regulations, in this case, regulations concerning various grounding techniques for electrical outlets. *Id.* By statute, OSHA was required to submit its proposed regulation(s) to an advisory committee for comment. *Id.* The D.C. Circuit found that an Assistant Secretary for OSHA violated the statutorily mandated procedures when "nothing like the assured grounding program was ever formally presented to or discussed by the [advisory committee]." *Id.* at 968. "Thus, the Assistant Secretary never availed himself, or apprised public commentators, of the Committee's expert views on the question of whether an assured grounding program could provide a useful supplement to the three-wire grounding system or a valuable alternative to [ground fault circuit interrupters]." *Id.* at 970.

The process dictated by Congress in this case is significantly different. Defendants were not required to submit a proposed DRS to the Advisory Committee for their opinion. Rather, the Expert Panel met first and issued its recommendations to the Secretary, which she was free to adopt or reject, so long as she provided a "clear rationale." The *National Constructors* decision offers no

guidance as to what is a "clear rationale" for departing from a committee's recommendation. The entire issue in that case was the fact that the committee was expected to have an opportunity to comment on the proposed regulation but was never afforded such an opportunity. 581 F.2d at 970.

In the context of the Administrative Record, the Court finds the Secretary offered a "clear rationale" for departing from the Advisory Committee recommendation regarding the automatic deficiency trigger. A cohort approach using two standard deviations from the mean would not be transparent and would provide significantly less transparency and clarity for both Head Start agencies and the public. The single deficiency trigger by contrast is clear and easy to understand. Moreover, unlike the standard deviation approach, Head Start agencies will have immediate notice that they will be required to compete upon receipt of the notice of deficiency, rather than having to wait for several years for reviews to be completed and then calculate the standard deviation. The Secretary offered a clear and reasonable explanation for this departure from the recommendations, and therefore the DRS is not invalid by departing from the recommendation regarding a deficiency trigger in the expert panel report.

### 3. The Secretary did not Rely on Unauthorized Facts in Creating the DRS

The Plaintiffs' final challenge to the statute contends that the DRS rule is arbitrary and capricious because it was designed with an overall goal to capture as many grantees for competition as possible, while Congress intended the system to require only a small number of grantees to compete. Pls' Opp'n at 43-45. Plaintiffs contend that the Secretary's decision to enact a system expected to require between thirty and forty-two percent of grantees to compete is inconsistent with the directive from Congress that "competition under the DRS should be very limited." *Id.* at 45. Plaintiffs never respond to Defendants' contention that the Plaintiffs do not have standing to challenge the DRS rule as a whole on this basis. Defs.' Cross-Mot. at 39-40. Therefore, the Court

does not consider Plaintiffs to challenge the validity of the entire DRS rule on the basis Defendants considered inappropriate facts in promulgating the designation system. *Evans v. Holder*, 618 F. Supp. 2d 1, 13 (D.D.C. 2009) ("Where, as here, a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.") (internal quotation marks omitted).

Despite wholly omitting any substantive response to the Defendants' standing arguments in their Reply, Plaintiffs make various assertions that could be construed as challenging the DRS as a whole. Therefore, although the Court finds Plaintiffs lack standing, the Court will briefly address the merits of Plaintiffs' contention that the Defendants considered inappropriate factors in constructing the entire DRS. *See Malyutin v. Rice*, No. 11-1597, 2012 WL 1242307 (D.D.C. April 13, 2012) (noting even where the Court finds a party lacks standing "where the Plaintiff has had a full and fair opportunity to contest the other grounds for dismissal, the Court has the power to dispose of the case on the merits") (citing *Simpkins v. District of Columbia*, 108 F.3d 366, 370 (D.C. Cir. 1997)). The Conference Report cited by Plaintiffs in support of this argument does not indicate Congress intended "very limited competition." H.R. Conf. Rep. No. 110-439, at 111 (2007), *reprinted in* 2007 U.S.C.C.A.N. 442, 462. The Report makes only two claims regarding the scope of competition: (1) that it should be limited to "under-performing Head Start agencies"; and (2) that Congress "d[id] not intend for this new designation system to result in competition for designation for the majority of Head Start programs." *Id.*; *accord* H.R. Rep. 110-67, at 61 (2007) ("These provisions are not intended to give the Secretary discretion to re-compete the majority of Head Start

programs."). Congress did not give any further indication as to how many grantees it thought should be required to compete under the designation system promulgated by the Secretary.[6]

Plaintiffs attempt to recast the argument in their Reply, alleging that the Secretary's rationale for departing from the expert recommendation regarding the deficiency trigger was a pretext for requiring as many grantees to compete as possible.[7]  After briefing concluded, the Plaintiffs also filed a Notice of Supplemental Authority, attaching a recent decision by Judge Rudolph Contreras, *Ass'n of Private Colleges & Universities v. Duncan*, No. 11-1314, 2012 WL 2505237 (D.D.C. June 30, 2012), which Plaintiffs claim supports their argument that "Defendants adopted the standards in the DRS with the goal of ensuring that the maximum number of Head Start grantees would be forced to recompete for their Head Start funding, and that this goal is inconsistent with Congress's intent." Pls.' Notice at 1.  The *Private Colleges* case concerned certain regulations promulgated by the Department of Education that defined eligibility to accept federal student loans based on the debt load and debt repayment rates of an institution's students.  *Id.* at *1.  Judge Contreras found the regulation requiring a minimum repayment rate of thirty-five percent to be arbitrary and capricious because the Department of Education offered no explanation for the thirty-five percent figure.  *Id.* at *15.  The only rationale offered by the Department of Education was that "failing fewer programs would suggest that the test was not meaningful while failing more would make for too large a subset of programs that could lose eligibility."  *Id.*  As Judge Contreras explained:

---

[6]  To the extent the 2010 letter from Senator Tom Harkin to the Secretary, A.R. 07672-73, can be considered "legislative history," the Court notes the letter describes the twenty-five percent quota included in the proposed rule as "arbitrary," but does not otherwise indicate how many grantees Congress intend to require to compete under the DRS.

[7]  The Defendants do not argue that the Plaintiffs lack standing to raise this argument as to the single deficiency trigger in isolation.

That this explanation could be used to justify any rate at all demonstrates its arbitrariness. If the Department had chosen to disqualify the bottom ten percent of programs, or the bottom half, it would have offered the same rationale: the rate chosen disqualified the percentage of programs that it was intended to disqualify, and to have disqualified fewer would have made the test too lenient while disqualifying more would have made the requirement too stringent. This is not reasoned decisionmaking.

*Id.*

*Private Colleges* is inapposite to this case for several reasons.  The question before Judge Contreras was essentially whether the threshold number of programs the Department of Education sought to disqualify was arbitrarily selected.  The underlying statute and Congressional intent were irrelevant to Judge Contreras' conclusion that the standard adopted by the Department of Education was arbitrary and capricious.  Here, the relevant issue, as framed by the Plaintiffs' pleadings, is Congress' intent regarding the scope of competition under the DRS.

In addition, the order of events in this case is the opposite of what occurred in *Private Colleges*.  In that case, the Department of Education decided to create a standard that would disqualify one quarter of all eligible programs.  2012 WL 2505237, at *14.  With that cut-off in mind, the Department of Education reverse engineered the repayment rate incorporated into the regulations.  *Id.*  When the regulations were later challenged, the Department of Education had no explanation as to why the repayment rate that was selected was a good measure of whether or not a program was failing.  *Id.* at *15.  By contrast, in this case, Congress, the expert panel, and HHS all recognized that deficiency findings provided at least some indication of the quality of services being provided by Head Start agencies.  The expert panel recommended using a trigger of two-standard deviations from the mean, and HHS proposed a single deficiency trigger.  HHS then analyzed, as part of the final decision-making process, how many grantees would be required to compete under each standard.  The order of events is significant because calculating the number of grantees that

would be forced to compete because of a particular factor is at least one method of *verifying* that the factor is a reliable indicator of the quality of services being provided. For example, if a proposed factor would require *no* grantees to compete, the Secretary may reasonably conclude that factor does not adequately capture low-performing grantees. Conversely, if a factor would require seventy percent of grantees to compete, the Secretary may reasonably conclude that factor is over-inclusive, and captures both low- and high- performing grantees. In this case, the Secretary had an independent reason to believe deficiency findings were a good indicator of program quality before performing any statistical analysis, and Plaintiffs have not shown that the analysis performed by the Secretary was intended to create a system enforcing a pre-selected and arbitrary cut-off as in *Private Colleges*. Overall, the record indicates the Secretary selected the single deficiency trigger on the basis of factors that Congress intended to be part of the decision-making process.

## IV.  CONCLUSION

For the foregoing reasons, the Court finds Plaintiffs failed to establish any claim to overturn the Designation Renewal System promulgated by the Secretary as required by the 2007 Reauthorization of the Head Start program. Under Circuit precedent, the system's reliance on antecedent data to decide future eligibility for automatic renewal of grants does not mean the rule is retroactive. Plaintiffs failed to identify any protected property or liberty interest that requires heightened due process from the Secretary, and the due process provided is constitutionally adequate. Finally, the DRS is a reasonable interpretation of Congress' instruction, the Secretary provided a clear rationale for departing from the recommendations of the expert panel, and there is no indication the Secretary relied on inappropriate considerations in deciding to enact the single deficiency trigger as part of the DRS. Accordingly, Plaintiffs' [16] Motion for Summary Judgment

is DENIED and Defendants' [18] Cross-Motion for Summary Judgment is GRANTED.  Plaintiffs'

[23] Motion to Strike or, in the Alternative, Motion for Leave to File Surreply is also DENIED.

An appropriate Order accompanies this Memorandum Opinion.

_____/s/_____
**COLLEEN KOLLAR-KOTELLY**
UNITED STATES DISTRICT JUDGE