**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

OHIO HEAD START ASSOCIATION,
INC., *et al.*,

     Plaintiffs,

        v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

     Defendants.

**Civil Action No. 12-309 (CKK)**

**MEMORANDUM OPINION**
(November 5, 2012)

Pursuant to a congressional directive, in 2011, the United States Department of Health and

Human Services ("HHS") promulgated regulations requiring low-performing grantees to compete

for five-year grants, rather than receive automatic renewal of their grants under the Head Start

program.  The Plaintiffs, four not-for-profit membership corporations that provide services to

community action agencies receiving Head Start grants, filed suit alleging the so-called Designation

Renewal System is unconstitutional and violates the Administrative Procedures Act.  The Court

rejected the Plaintiffs' challenges, and entered final judgment in favor of the Defendants on July 9,

2012.  Nearly two months after the entry of final judgment and one month after filing their notice of

appeal, the Plaintiffs now ask the Court to bar HHS from implementing the Designation Renewal

System while Plaintiffs' appeal is pending.  Upon consideration of the parties' pleadings,[1] the

relevant legal authorities, and the record before the Court, the Court finds the Plaintiffs failed to

---

1  See Pls.' Mot. for Inj. Pending Appeal ("Pls.' Mot."), ECF No. [33]; Defs.' Opp'n, ECF
No. [34]; Pls.' Reply, ECF No. [35].

show an injunction pending appeal is warranted in this case. Accordingly, Plaintiffs' [33] Motion for Injunction Pending Appeal is DENIED.[2]

## I. BACKGROUND

The Court detailed the factual background and rule making process at length in its prior memorandum opinion, and incorporates by reference that discussion herein. 7/9/12 Mem. Opin., ECF No. [30], at 2-9. In short, Head Start is a national program that provides health, educational, nutritional, and other services to children of low income families in order to promote school readiness. Admin. Record ("A.R.") 03326 (DRS Final Rule). In some locations, umbrella agencies receive Head Start grants, but delegate the provision of actual services to member agencies. A.R. 00284 (Oct. 2008 Advisory Comm. Report). In this case, the members of the Plaintiff organizations, known as community action agencies, receive grants directly from the Head Start program. Am. Compl. ¶¶ 2-5. Regardless of the grant structure, the agency responsible for directly providing services is known as a "Head Start agency." A.R. 03345 (DRS Final Rule). In order to monitor the quality of services provided by grantees and delegate agencies, the Head Start program conducts four types of reviews (1) reviews of newly designated Head Start agencies following the first year of providing services; (2) triennial reviews, evaluating each Head Start agency at least once during a three year period; (3) follow-up reviews of Head Start agencies found to have at least one deficiency or significant areas of non-compliance; and (4) unannounced on-site visits. 42 U.S.C. § 9836a(c)(1); *see also* 42 U.S.C. § 9836a(c)(2) (detailing the composition of review teams and areas of

---

[2] Because the Court finds the balance of the equities weigh heavily against granting the requested injunction, the Court does not reach the Defendants' claim that the scope of the requested injunction is overly broad. Defs.' Opp'n at 15.

assessment).  On-site reviews may lead to identification of two types of violations: deficiencies and non-compliances.  A deficiency is defined as

(A)     A systemic or substantial material failure of an agency in an area of performance that the Secretary determines involves-

(i)     a threat to the health, safety, or civil rights of children or staff;

(ii)    a denial to parents of the exercise of their full roles and responsibilities related to program operations;

(iii)   a failure to comply with standards related to early childhood development and health services, family and community partnerships, or program design and management;

(iv)    the misuse of funds received under this subchapter;

(v)     loss of legal status (as determined by the Secretary) or financial viability, loss of permits, debarment from receiving Federal grants or contracts, or the improper use of federal funds; or

(vi)    failure to meet any other Federal or State requirement that the agency has shown an unwillingness or inability to correct, after notice from the Secretary, within the period specified;

(B)     systemic or material failure of the governing body of an agency to fully exercise its legal and fiduciary responsibilities; or

(C)     an unresolved area of noncompliance.

42 U.S.C. § 9832(2).  If a Head Start agency is found to violate "Federal or State requirements . . . in ways that do not constitute a deficiency," the agency will be labeled as "non-compliant."  45 C.F.R. § 1304.61(a).  The Secretary "will notify the grantee promptly, in writing, of the finding, identifying the area or areas of noncompliance to be corrected and specifying the period in which they must be corrected."  *Id.*  A non-compliance will be re-classified as a deficiency if the grantee fails "to correct the specified areas of noncompliance within the prescribed time period."  *Id.* § 1304.61(b).

As part of the various types of program reviews set forth in the statute, teams of monitors perform on-site inspections evaluating each Head Start agency's compliance with "program, administrative, financial management, and other requirements."  42 U.S.C. § 9836a(c)(1); A.R. 03331 (DRS Final Rule).  If issues are identified on-site, the monitoring team will speak to agency personnel during the process of the review.  A.R. 03332; *e.g.*, A.R. 01604 ("[T]he Site Director at the [Head Start agency] confirmed the metal screws protruding from the fenceposts posed a safety hazard.").  The review team submits evaluation materials to HHS, and experts from the Office of Head Start and ACF determine if the agency is non-compliant or deficient.  A.R. 03332.  "The Act does not provide for an appeal of deficiency findings."  *Id.*  However,

> [G]rantees currently have the opportunity to discuss the progress of the monitoring review while the review team is on site.  Although the final determination is not made during the on-site review, grantees consistently are informed of the opportunity to provide additional input when concerns are identified while the team is on-site.

*Id.*  If an agency fails to correct the deficiency within the relevant time frame, HHS will issue a letter of termination, which may be appealed to the Departmental Appeals Board.  *Id.* § 9836a(e)(1)(C); A.R. 03331.

Historically, Head Start grants were issued for a single year but automatically renewed each year until the grantee relinquished the grant or HHS terminated the grant.  A.R. 00001 (Proposed DRS Rule).  The Government Accountability Office issued a report in 2005 criticizing this practice, finding that "[w]hen grants are allowed to remain with poorly performing grantees, children being served may not be getting the 'head start' they deserve because the grantees continuously fail to meet program and financial management standards."  *Id.*  As part of the Improving Head Start for School Readiness Act of 2007, Congress instructed the Defendants in this action, the United States Department of Health and Human Services ("HHS") and Kathleen Sebelius, Secretary of HHS

(collectively, "Defendants" or "the Secretary"), to promulgate regulations requiring low-performing grantees to compete for five-year grants, rather than receive automatic renewal of their grants under the Head Start program. 42 U.S.C. § 9836(c)(1). The resulting Designation Renewal System requires recipients of Head Start grants to compete for new five-year grants if, among other things, the grantees received one or more "deficiency" findings during the relevant time period.[3] Plaintiffs filed suit against HHS and Secretary Sebelius in her official capacity, alleging that the so-called "single deficiency trigger" is invalid because it (1) is impermissibly retroactive; (2) deprives Plaintiffs of protected property and liberty interests without due process; and (3) is arbitrary and capricious. Am. Compl., ECF No. [8], ¶¶ 71-79. The Court granted summary judgment in favor of the Defendants on all claims on July 9, 2012. *See generally* 7/9/12 Mem. Opin., ECF No. [30]. The Plaintiffs now ask the Court to enjoin the awarding of new grants in geographic areas covered by Plaintiffs' member agencies pursuant to the DRS.

## II. LEGAL STANDARD

In evaluating the Plaintiffs' motion for an injunction pending appeal, the Court evaluates four factors: (1) the Plaintiffs' likelihood of success on the merits of their appeal; (2) any irreparable harm to the Plaintiffs absent a stay; (3) whether issuing a stay would substantially harm the other interested parties; and (4) the public's interest. *Wash. Metro. Area Transit Comm'n v. Holiday*

---

[3] In addition to the single deficiency trigger, the final rule requires a Head Start agency to compete for a new grant if the agency (1) fails to establish appropriate program goals; (2) fails to take specified steps to achieve "school readiness goals"; (3) receives classroom observation scores below a certain threshold; (4) has its state or local operating licenses revoked; (5) is suspended from the Head Start or Early Head Start program by ACF; (6) is barred from receiving state or federal funds; or (7) is at risk of failing to function as a going concern at any point in the twelve months prior to designation under the DRS. A.R. 3346 (DRS Final Rule, 45 C.F.R. § 1307.3(b)-(g)).

*Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977).  These factors "have typically been evaluated on a

sliding scale."  *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009).

### III. DISCUSSION

A.      *Plaintiffs Fail to Show a Likelihood of Success on the Merits*

The Plaintiffs contend they are likely to succeed with their appeal because the Court erred in

three ways: (1) finding the Plaintiffs did not have a protected property interest in automatic renewal

of their grants; (2) finding HHS provided sufficient due process before depriving the Plaintiffs of

their protected property interest; and (3) finding Congress did not expressly preclude the Defendants

from promulgating a single-deficiency trigger as part of the DRS.  None of these arguments are

persuasive.

1.      Plaintiffs' Due Process Claim

Initially, the Plaintiff contends the Court erred in finding the language of the Reauthorization

did not create a sufficient substantive predicate to create a protected interest in automatic renewal of

their Head Start Grants.  The Plaintiffs cite *Hewitt v. Helms*, 459 U.S. 460 (1983), for the proposition

that "broadly or generally worded laws and rules can comprise sufficient 'substantive predicates' for

the purposes of determining the existence or absence of a property interest."  Pls.' Mot. at 8.  In

*Hewitt*, the Supreme Court concluded that the combination of "unmistakably mandatory character,

requiring the certain procedures 'shall,' 'will,' or 'must' be employed," used in conjunction with

"specific substantive predicates"—namely that administrative segregation will not occur absent "the

need for control" or "the threat of a serious disturbance"—"demands a conclusion that the State has

created a protected liberty interest."  459 U.S. at 472 (quoting 37 PA Code § 95.103(b)(3)).

The language in the Reauthorization Act is far cry from the statute at issue in *Hewitt*.  "High

quality and comprehensive" is not a *specific* substantive predicate.  "High quality" is significantly

more vague that "the need for control."  Congress recognized as such when it required the Defendants to convene an expert panel to provide guidance as to what the term means.  For the reasons stated in the Court's prior Memorandum Opinion, the Reauthorization Act did not create a sufficient substantive predicate so as to create a protected property interest in automatic renewal of Head Start grants.

The Plaintiffs further contend that the DRS itself sufficiently limited HHS's discretion so as to create a protected property interest.  The Court notes that the Plaintiffs failed to raise this argument in their motion for summary judgment. Pls.' Mot. for Summ. J., ECF No. [16-1], at 32-36.  Even if the Court were to accept this argument, the Plaintiffs are still afforded sufficient due process.  7/9/12 Mem. Opin. at 24-29.

Contrary to the Plaintiffs' assertion, the Court never concluded that Head Start agencies/grantees must have an opportunity to challenge HHS's finding of an underlying DRS trigger.  Rather, assuming the Plaintiffs are correct that there are inconsistencies or other issues with the on-site review process, the Court found the opportunity Head Start agencies are provided is sufficient due process to avoid any erroneous deprivation that might occur from requiring a grantee to re-compete.  Missing from the Plaintiffs' motion for an injunction is the proper legal framework for evaluating their due process claim: the three-factor balancing test articulated in *Mathews v. Eldridge*, 424 U.S. 319 (1976).  *See* 7/9/12 Mem. Opin. at 25-29.  On balance, the Plaintiff still fails to demonstrate that any additional procedures are necessary to satisfy due process.

Before addressing the relevant factors, the Court notes that the Plaintiffs take issue with what procedures are actually provided by HHS before a deficiency finding is issued. Specifically, the Plaintiffs argue that there is no evidence in the record to indicate that grantees "have an 'opportunity to respond' to an on-site review team's identification of potential deficiencies." Pls.' Mot. at 8.  To

7

the contrary, the Administrative Record reflects the fact that on-site review teams discuss potential issues with responsible officials at the relevant Head Start agency before any deficiency finding is made. *E.g.*, A.R. 1604 ("The Health Content Expert/Health Coordinator at Community United Head Start and Day Care, Inc., and the Site Director at the Mather Early Learning Center confirmed the metal screws protruding from the fenceposts posed a safety hazard."); *id.* ("An observation at the Oakfield Child Enrichment Center found an unlabeled inhaler with no child's name or prescription directives in an unlocked first aid kit. The Director, Administrator, and teacher confirmed the medication was not in a locked box and was not labeled with prescription directives."). The Plaintiffs fail to point to any evidence to refute the fact that "grantees consistently are informed of the opportunity to provide additional input when concerns are identified while the team is onsite." A.R. 3332 (Final Rule, Response to Comment 5). Moreover, the Plaintiffs cite no authority for their assertion that the Plaintiffs must be provided an opportunity to provide evidence to the agency board responsible for making the final deficiency determination. Head Start agencies are notified of issues identified while the review team is on-site, and the relevant officials at the Head Start agencies have an opportunity to provide input, which is transmitted to the relevant decision-making body at HHS. *E.g.*, A.R. 1604 (citing interviews with relevant Head Start Agency personnel by the on-site review team as part of the deficiency finding). Plaintiffs have not argued that the on-site review teams do not accurately transmit information provided by Head Start agencies to the final decision makers or otherwise shown that due process further requires an opportunity to present additional information directly to the HHS officials making the final deficiency determination. The Head Start agencies are placed on notice by the on-site review teams that an issue may lead to a non-compliance or deficiency finding, and relevant officials from the Head Start agencies have an opportunity to respond.

In terms of the *Mathews* factors, the degree of potential deprivation is still slight: erroneous deprivation of a grantee's "right" to automatic renewal at best causes the grantee to expend minimal time and effort to apply for a grant for the next cycle. The Plaintiffs contend that "Defendants' designation of grantees as 'poor performers' or 'low performing' will impair those grantees' ability to compete for continued Head Start funding." Pls.' Mot. at 10. Assuming for purposes of this argument that Plaintiffs' contention is correct—which it is not, *see infra* at Section III.B.—it only holds true for grantees that were properly identified as having one or more deficiency findings. If the deficiency finding was *erroneous*, then there is no reason to believe the grantee would be at a disadvantage in the re-competition process; the review board evaluating the applications for the grants will be able to see the grantee is capable of providing high quality services in the future. In other words, the cost of requiring competition is minimal, and the risk of terminating grants for agencies wrongfully labeled as not providing high quality and comprehensive services is slight.

Second, the existing procedures are fair and reliable. The Plaintiffs take issue with HHS's legal determinations, but not their factual findings; thus there is no reason to believe additional opportunities to be heard will increase the "fairness" or "reliability" of the on-site review or deficiency finding process. The Plaintiffs simply quote their own assertions from their initial motion, and simply ignore the Court's thorough analysis of the deficiency findings in the record. 7/9/12 Mem. Opin. at 27-28. The Plaintiffs re-assert their position that the deficiency finding against the Child Development Council of Franklin County was in error. Pls.' Mot. at 13. However, on the present record, the Court cannot find that HHS was unwarranted in issuing a deficiency finding after a grantee spent in excess of $41,000 on gift cards for employee Christmas gifts. Decl. of M. James, ECF No. [16-12], ¶ 23. The fact that the Child Development Council's internal guidelines purportedly authorized the expenditure does not make this use of Head Start funds in this

manner any less egregious.  To the extent the deficiency finding against the Community Action Commission of Fayette County was somehow in error, the Plaintiffs fail to explain how any additional procedures would have prevented the same outcome.  The Declaration submitted from the agencies Executive Director, Bambi Baugh, reflects the fact that over the course of a year, the agency worked with HHS personnel to try and resolve the non-compliance/deficiency at issue.  Decl. of B. Baugh, ECF No. [16-8], ¶¶ 15-20.  There is nothing in the record to indicate (1) the Plaintiffs lacked notice and an opportunity to respond before the deficiency finding was issued; or that (2) any additional procedures would have changed the result.  The Court does not assume that on-site review teams and HHS officials never make mistakes.  But at the same time, *Matthews* does not require perfect procedures in order to satisfy due process.  To the extent the deficiency finding process is imperfect, on balance, additional procedures are not warranted.

Moreover, the Plaintiff offers no authority as to why the Court should ignore the Administrative Record in favor of Congressional findings regarding an on-site monitoring system *that no longer exists*.  Pls.' Mot. at 11-12.  This is particularly true given the fact that Congress (1) amended the definition of deficiency and the monitoring process; and (2) explicitly required HHS to consider on-site review data in designing the DRS system, 42 U.S.C. § 9836(c)(1)(B).  The Plaintiffs also emphasize that under the new on-site review system in place since the 2007 Reauthorization, the number of deficiency findings "more than doubled."  Pls.' Mot. at 12.  The Plaintiffs contend that this increase in findings "is inconsistent with a conclusion" that the Defendants are properly implementing the deficiency definition as modified by the 2007 Reauthorization.  The increase in deficiency findings could just as easily be read to reflect that HHS is more consistently identifying systemic or substantial material failures across Head Start grantees, or that in light of economic conditions between 2008 and 2010, grantees were less able to correct issues that were identified as

10

deficiencies by on-site teams.  In other words, without more, the Court cannot draw the conclusion the Plaintiffs urge from that statistic.

Notably, in their motion for an injunction, the Plaintiffs never address the third *Mathews* factor---the administrative burden and other societal costs that would accompany the additional proposed safeguards.  7/9/12 Mem. Opin. at 28.  To the extent the Plaintiffs have identified any incorrect deficiency finding, the Plaintiffs have never argued that an additional hearing before the HHS officials would have led to a different outcome.  On balance, the risk and cost of erroneous deprivation is slim, the current procedures are overall fair and reliable, and the administrative costs of increased procedures outweigh what little fairness might be gained by additional procedural protections.  Accordingly, the Court finds once again that the Plaintiffs have minimal likelihood of success on the merits of their due process claim.

> ### 2.   Plaintiffs' Administrative Procedures Act Claim

The Plaintiffs also claim they are likely to succeed on the merits of their Administrative Procedures Act claim upon appeal.  In reference to the Court's *Chevron* analysis, the Plaintiffs attempt to revive an argument that was first raised in their reply brief, but remains unpersuasive. The Court need not waste its and the parties' time repeating the entirety of its prior analysis. 7/9/12 Mem. Opin. at 29-40.  In short, the Plaintiffs contend that the Court should have found that, under the first step of *Chevron*, the statute was ambiguous as to the Secretary's authority to promulgate a single-deficiency trigger as part of the final DRS.  As an initial matter, the Plaintiffs offer no authority to support their claim that when a statute unambiguously grants discretion to the Defendants to promulgate certain rules, that the content of those rules is later reviewed under the first step of *Chevron* as opposed to the second step of *Chevron*.  Even if the Court were to undertake this analysis, the Plaintiffs fail to articulate how the statute itself is ambiguous as to the single-

deficiency trigger.  The Plaintiffs in essence look to the legislative history in order to create ambiguity in an otherwise clear statute.  Assuming *arguendo* that the statute was ambiguous on this front, the problem with the Plaintiffs' argument is that the legislative history does not indicate that "Congress has directly spoken to the precise question at issue."  *Chevron, U.S.A.*, *Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842 (1984).  To the contrary, the House Committee Report explicitly left open the possibility that the Secretary could enact a single deficiency trigger:

> The Committee includes the triennial review as part of this system because this extensive review generally contains a wealth of information. However, the Committee strongly encourages the expert panel and the Secretary to use this information more thoughtfully than simply tabulating whether a grantee has been deemed deficient or not.

H.R. Rep. 110-67, at 61 (2007).  The Plaintiffs' argument would require the Court to find that strong encouragement from a Committee is equivalent to explicitly barring HHS from taking a specific course of action.  The Plaintiffs cite *Colony, Inc. v. Commissioner*, 357 U.S. 28 (1958) for the proposition that "Courts have found similar explanatory statements in committee reports to be 'persuasive indications' of Congress's wishes in vacating agency interpretations of law that run contrary to those wishes."  Pls.' Mot. at 17. However, *Colony* pre-dated *Chevron*, and the legislative history was but one of several reasons the Court rejected the Tax Commissioner's interpretation of the statute.  The Plaintiffs did not cite a single case in which "encouragement" from Congress in the legislative history, absent more, was accepted as a direct and controlling statement from Congress for *Chevron* purposes that invalidates an agency interpretation that declined to follow Congress' recommendation.  The Court cannot overlook the fact the Committee recommended against a particular course of action as opposed to prohibiting it.  Therefore, the Court finds the Plaintiffs have failed to show a likelihood of success on their Administrative Procedures Claim on appeal.

12

The Court cannot say that the Plaintiffs' have demonstrated a *substantial* likelihood of success on the merits. *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995). On this basis alone, the Court could dispose of the Plaintiffs' motion. *See Apotex, Inc. v. Food & Drug Admin.*, 449 F.3d 1249, 1253-54 (D.C. Cir. 2006). Nevertheless, the Court shall briefly address the other factors relevant to the Plaintiffs' request.

>    B.    *Plaintiffs Will Not Suffer Irreparable Injury Absent an Injunction Pending Appeal*

The Plaintiffs contend that their member agencies will suffer irreparable harm if the DRS goes into effect pending resolution of the Plaintiffs' appeal because HHS "ha[s] structured the DRS in a manner that virtually guarantees that grantees required to recompete will lose their designation as Head Start agencies." Pls.' Mot. at 18. The Court explained at length in its prior opinion why this argument is faulty: in short, the Plaintiffs' argument conflates two different standards in two separate sections of the statute. 7/9/12 Mem. Opin. at 23-24 (comparing 42 U.S.C. § 9836(c) (regarding the requirements for the DRS) with 42 U.S.C. § 9836(d)(3) (indicating preference should be given to certain applications in areas in which no grantee receives automatic renewal)). Moreover, as the Defendants note, participation in the competition process is triggered by the grantees' past deficiencies, the results of the competition process are based on the applicant's *prospective* ability to provide services, and the Plaintiffs emphasize that their member agencies have corrected any previously identified deficiencies. There is nothing in the record to support the contention that it is "virtually guaranteed" that grantees forced to re-compete will not receive new grants on the basis of the designation to re-compete in and of itself.[4]

---

[4] To the extent grantees forced to re-compete actually provide lower-quality services than others competing for grants, then the grantees may not receive new grants as part of DRS competition process. Defs.' Opp'n at 6-7. It is the quality of the services the applicant can provide, not designation under the DRS itself, that is outcome determinative.

The Plaintiffs further contend that "the adverse business consequences of placement on the Recompete List for the Plaintiffs' members will intensify in the months to come if the Court does not enjoin the competition process pending resolution of the appeal." Pls.' Mot. at 21. However, the Plaintiffs fail to cite any examples of contracts, funding, or other "business consequences" that might occur in the coming months, apart from the termination of the grants if member agencies are not selected. The Plaintiffs' member agencies were notified in early 2012 that they would be forced to re-compete, and the final round of applications closed in August 2012. The Plaintiffs provide no explanation as to why now, eight months after the member agencies were designated for competition, unspecified "business consequences" will "intensify," or the member agencies' "ability to attract and retain staff" will be further impaired. *Id.* Moreover, the Plaintiffs fail to explain why any of these effects are *irreparable*. At best, the Plaintiffs have "only vaguely sketch[ed] the contours" of the asserted harms. *Cuomo v. U.S. Nuclear Regulatory. Comm'n*, 772 F.2d 972, 976 (D.C. Cir. 1985). The Plaintiffs' motion falls far short of showing that the injuries they face are "both certain and great." *Id.* (citations omitted). Therefore, the Court finds that the Plaintiffs' face a minor risk of irreparable injury absent an injunction pending appeal.

> C.      *Risk of Substantial Harm to Other Interested Parties*

The Plaintiffs assert that "the adverse impact of an injunction on HHS would be insubstantial." Pls.' Mot. at 21. Staying the DRS pending appeal would amount to more than simply pressing the pause button on the re-competition process. If the Court of Appeals upholds the grant of summary judgment in favor of the Defendants, the delay will have made the information in the grant applications stale, requiring a new round of applications and review before grants can be finally awarded. Decl. of S. Pinckney, ECF No. [34-1], ¶¶ 10-11. The delay would ultimately require the expenditure of significant resources and further delay in naming grantees and service

providers.  *Id.*  Even if the injunction was limited to only those geographic areas covered by Plaintiffs' member agencies that are subject to re-competition, this would still amount to re-doing the entire grant application and review process for over 10% of the geographic areas receiving Head Start grants subject to competition.  *Id.* at ¶ 9.  Weighed against the potential irreparable injury articulated by the Plaintiffs, the Court finds the substantial risk of harm to other interested parties outweighs the risk of harm to the Plaintiffs.  As such, the balance of harms favors denying the Plaintiffs' motion.[5]

> D.    *Public Interest*

As in most cases, the public interest is essentially a wash.  The public has a vested interest in ensuring that Federal Agencies enforce laws enacted by Congress.  In other words, the final factor favors whatever party prevails on appeal.  *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998) (noting that "the public interest, also offers [Plaintiff] no support because it is inextricably linked with the merits of the case").  Additionally, the public has a vested interest in ensuring that Head Start agencies are providing high quality services, including a safe environment for the children receiving services.  Insofar as the Plaintiffs' member agencies have been cited for deficiencies regarding safety violations, implementation of the DRS will provide HHS the opportunity to evaluate these agencies' capacities for providing a safe environment in the future.  In this respect, the public has a vested interest in permitting the re-competition process to move forward.  Thus, the public interest weighs in favor of denying the requested injunctions.

---

[5]  It is also worth noting that enjoining the DRS would delay providing grants to agencies (other than those represented by the Plaintiffs) that would receive grants as part of the DRS competition.  Thus to the extent the lack of an injunction impairs the business interests of the Plaintiffs, that injury is counterbalanced by the injury to other grantees whose funds will be delayed by the injunction.  *See Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998).

**IV.  CONCLUSION**

For the foregoing reasons, the Court finds Plaintiffs failed to establish that an injunction pending appeal is warranted.  The Plaintiffs failed to show any likelihood of success on the merits, which weighs heavily against granting the Plaintiffs' motion.  The Plaintiffs failed to demonstrate they will suffer irreparable harm absent an injunction.  Conversely, the Defendants would have to expend significant resources if the competition process was enjoined, and the injunction would significantly delay naming new grantees to provide Head Start services.  Ultimately, the public interest weighs against an injunction.  On balance, the Court finds the equities do not weigh in favor of enjoining implementation of the DRS pending resolution of the Plaintiffs' appeal.  Accordingly, Plaintiffs' [33] Motion for Injunction Pending Appeal is DENIED.

An appropriate Order accompanies this Memorandum Opinion.

_____/s/_____
**COLLEEN KOLLAR-KOTELLY**
UNITED STATES DISTRICT JUDGE